### INDEPENDENCE INDEMNITY CO. v. POLK. (No. 9229.)

Court of Civil Appeals of Texas. Galveston. Jan. 29, 1929.

Rehearing Denied Feb. 21, 1929.

Haynes Shannon, of Navasota, and C. A. Lord, of Beaumont, for appellant.

W. W. Heath, of Anderson, and A. M. Vance, of Houston, for appellee.

LANE, J. On the 15th day of January, 1926, Ruble E. Polk was an employee of Pure Oil Pipe Line Company of Texas, which was a subscriber, as that term is used in our workmen's compensation statute (Rev. St. 1925, arts. 8306–8309), and which, it is claimed by appellee, held a policy of compensation insurance issued by Independence Indemnity Company. On the above-named date said Ruble Polk, while in the course of his employment, suffered an injury to his right foot and ankle. In time and manner as required by law, said Polk gave due notice of his injury, and filed his claim with the Industrial Accident Board of Texas; on the 2d day of December, 1927, the board made its final award. Within the time and manner as required by law, said Polk gave notice to the board, to the Pure Oil Pipe Line Company, and to the Indemnity Company that he would not abide by the decision of the board, and that he would bring suit to set such decision aside. In due time after giving such notice, Polk filed this suit in the district court of Grimes county to set aside the award made by the board. In his petition he alleged his injuries and the facts as above stated, and prayed for a recovery of his damages against the Independence Indemnity Company.

The Independence Indemnity Company answered by general denial. The cause was tried before the court without a jury, and judgment was rendered for the plaintiff, Polk, against the defendant, Independence Indemnity Company, for the sum of $5,980.-

31, providing that one-third of such sum should be paid to W. W. Heath, the plaintiff's attorney. The Indemnity Company has appealed.

Upon a request by appellant for findings of fact and conclusions of law, the court found, in addition to the facts hereinbefore stated, the following:

"That on January 15, 1926, defendant had theretofore issued its policy of workmen's compensation insurance to said Pure Oil Pipe Line Company of Texas, in accordance with the terms of the Workmen's Compensation Law of the state of Texas, and said policy of insurance was in force on said date. That on January 15, 1926, plaintiff sustained personal injuries, while about the due and customary duties of said employment, consisting of a complete fracture of the os calcis. That, as the direct and natural result of the fracture of the os calcis, plaintiff has developed a neuritis along the course of the sciatic nerve from the foot upward through his leg, thigh, and hip, and into his back, and since the said date of his injuries has suffered, and will continue to suffer for the rest of his life, from pain in his foot and ankle and along the course of the sciatic nerve above described.

"That all the injuries from which plaintiff has suffered since January 15, 1926, and from which he will continue to suffer as aforesaid, were proximately caused by the fracture of os calcis, received by plaintiff on said date. That as a direct and natural result of the said injuries received by plaintiff on January 15, 1926, plaintiff has been totally incapacitated from performing the usual and customary tasks of a workman to such an extent as to disable him from securing and retaining employment, at all times since the date said injuries were received, and such total incapacity is permanent.

"That defendant has paid to plaintiff 53 weekly payments of compensation of $20 per week, in the total sum of $1060, same covering the period from the date of plaintiff's injuries to January 28, 1927, after taking into account the waiting period of one week, and that defendant has made no other payment of compensation to plaintiff. That plaintiff's case is a special case within the meaning of the Workmen's Compensation Law, and that manifest hardship and injustice will result unless plaintiff's compensation be paid to him in a lump sum. That, as of February 10, 1928, there were unaccrued and unpaid and due plaintiff 54 weeks of compensation at the rate of $20 per week.

"That on January 15, 1926, Pure Oil Pipe Line Company of Texas was a subscriber under the Workmen's Compensation Law of Texas, as the term 'subscriber' is defined in said law. That plaintiff is entitled to have said compensation paid to him in a lump sum, subject to a depreciation of said lump sum payment for present value on the basis of in-

terest on the unaccrued payments involved at the rate of 6 per cent. per annum.

"That the law is with the plaintiff, and therefore the plaintiff is entitled to payment of compensation at the rate of $20 per week for the period of 401 weeks, less the waiting period of one week, and less the sum of all previous payments of compensation already made to plaintiff by defendant, with interest at the rate of 6 per cent. per annum on all payments of compensation which were accrued on the date of the final judgment of the court in this cause from the respective dates of accrual of said respective accrued payments (which interest on said accrued payments was computed by the court as of February 10, 1928, for convenience), and less the depreciation aforesaid of said lump sum payment for present value, which, after performing the necessary and proper process of calculation, amounts to the sum of $5,980.31, the sum of compensation which plaintiff was entitled to be paid as of the date of the final judgment in this issue."

By appellant's eighth, ninth, and tenth propositions contention is made that the court erred in finding that appellant had, prior to January 15, 1926, same being the date on which appellee received his injuries, issued its policy of workmens' compensation insurance to the Pure Oil Pipe Line Company, and that such policy was in force on said date, and in finding that on such date the Pure Oil Pipe Line Company was a subscriber under the Workmen's Compensation Law of Texas, in that there was no evidence whatever that appellant had issued any such policy to the Pure Oil Pipe Line Company, or that the last-named company held any such policy at the time of appellant's injury. Therefore the plaintiff failed to establish any compensation claim or jurisdiction in the trial court.

We overrule such contention. We think there was sufficient evidence to support the findings complained of. The undisputed evidence shows that on the 15th day of January, 1926, the time of his injury, appellee, Polk, was an employee of the Pure Oil Pipe Line Company, and that at such time he was engaged in the performance of his duties as such employee.

It is shown that on or about the plant or premises of the employer, where appellee was required to work, there were posted notices relative to the Workmen's Compensation Law, stating that the Pure Oil Pipe Line Company had insured its employees with the Independence Indemnity Company; that such notices were there at the time of appellee's injury; that it was stated in such notices that the employés, in case of injury, were to keep account of expenditures incurred at the hospital by reason of such injury, and return them to the Independence Indemnity Company for refund; that appellee kept such account, and that Homer E. Sanders, adjuster for the

Independence Indemnity Company, paid such expenses by checks signed "Homer E. Sanders, Adjuster for Independence Indemnity Company"; that in a few days after appellee was injured the Independence Indemnity Company began to pay him weekly compensation under the provisions of the Workmen's Compensation Statute.

Relative to such payments and the manner in which and by whom same were made, appellee testified as follows: "I got 53 payments in all, I believe. Each payment was $20. It was the Independence Indemnity Company that made the payments. Mr. Homer E. Sanders delivered some of these checks in person. * * * He [Sanders] is the adjuster for the Independence Indemnity Company. He said, 'I am your insurance man, and want to know how you are getting along;' and I told him, I couldn't tell. * * * He said he was the Independence Indemnity Company's adjuster, and, if I needed anything, he would see that I got it. He has given me in person and has mailed me checks signed by 'Homer E. Sanders, Adjuster for Independence Indemnity Company.' He told me he was their adjuster, Independence Indemnity Company's adjuster."

And again plaintiff testified: "This company, Pure Oil Pipe Line Company of Texas, was known as the Pure Oil Company when I worked for them the first time. I think it was changed to the Pure Oil Company of Texas, and later known as the Pure Oil Pipe Line Company of Texas."

It was shown that Homer E. Sanders told W. W. Heath, attorney for appellee, that he was the adjuster of the Indemnity Company, and that said company was the insurer of appellee, Polk. It was shown that Homer E. Sanders represented the Indemnity Company in the proceedings of the Industrial Accident Board relative to the claim of appellee. The testimony establishing the facts above stated was undisputed.

In his petition the plaintiff alleged that the policy issued by appellant to the Pure Oil Pipe Line Company was inaccessible to him, but was accessible to the defendant, and called upon defendant to produce the same upon the trial, etc. We think the trial court could but reasonably conclude from the facts stated that the employer of appellee did in fact hold a policy of compensation insurance issued by appellant, at the time appellee received his injury.

In Texas Employers' Insurance Association v. Pierce (Tex. Civ. App.) 254 S. W. 1019, the question arose as to whether or not facts and circumstances might be shown to prove that a party was a subscriber under our Workmen's Compensation Act, in the event the policy creating him such is in existence and not produced. In deciding the question the Dallas court said:

"The policy is never in the possession of the employé, but is in the possession and control of the employer, and great inconvenience would result in many cases, where the employer has a large number of employés, with many claims pending and in litigation at the same time and in different places, if the policy is to be the only sufficient evidence. In the absence of any claim that the policy is narrower in its terms than is contemplated by the act, the court may assume that it is not. Huddleston v. Texas Pipe Line Co. (Tex. Civ. App.) 230 S. W. 250."

That court further held that it must be kept in mind that policy in such case is in the possession and control of the employer, who is not to be regarded as a stranger or "third party" to the insuring company, and that secondary evidence to prove the issuance and existence of such policy is admissible, the policy not having been produced on the trial after written notice had been given by the plaintiff to the defendant.

In Georgia Casualty Co. v. Ginn (Tex. Civ. App.) 272 S. W. 601, it was shown that a claimant under our Compensation Law had been paid installments on his claim of compensation by the insurance company for several months before the claimant resorted to the Industrial Accident Board to compel further payments, just as in the present case. In that case, as here, the insurance company contended that the evidence did not show that the insurance company was carrying compensation insurance of the claimant's employer at the time of the injury complained of. In disposing of that contention the San Antonio court said:

"Under the facts in this case, showing the conduct of appellant in making these partial payments and its acquiescence, it does not lie in the mouth of appellant to now deny the issuance of this policy. It was in possession of its own books and records relating thereto, and, if it had not issued such a policy, it was in a position to make the proof, and its silence or failure to produce the evidence will be construed most strongly against appellant."

Many authorities are cited in support of such holding.

By appellant's first, second, and third propositions, contention is made that the court erred in finding that the injury to appellee was proximately caused by a fracture of the os calcis (heel bone), and that such injury totally and permanently incapacitated him, and, upon such findings, rendering judgment for appellee as for total and permanent disability, because appellee introduced in evidence written statements from Dr. Glass, who treated him to the effect that there was no evidence of a fracture of the heel bone; that no evidence of such fracture could be found; such statements showing that appellee was not totally and permanently disabled. Extracts from the statements referred to as

having been made by Dr. Glass, and which for some inexplicable reason were introduced in evidence by counsel for appellee, were substantially as follows:

By Dr. Glass: "We have made two X-ray plates of this foot * * * and are unable to find any evidence of fracture, dislocation, or diseased condition of any bones. Several X-ray pictures have been made, and we have never been able to find any evidence of fracture. We have made two X-ray plates of his foot in the last six or eight weeks, and are unable therefrom to find any evidence of fracture, dislocation, or diseased condition of any of the bones." Again: "I believe that this condition will gradually clear up, but no doubt this man is going to be disabled for a period of three to six months from this date."

In support of the foregoing contention, counsel for appellant argues that, since appellee offered in evidence the statements from which the above extracts were taken, and others of practically the same import, he is bound by their recitations and cannot question their truth. We overrule the contention of appellant. We have read the whole of the statements from which the extracts mentioned were taken, and have reached the conclusion that they show only that the doctor had been unable, by means of X-ray plates made of appellee's foot, to discover any fracture of the heel bone. Nowhere is it positively stated that there was in fact no such fracture. In letters written by Dr. Glass, introduced in evidence by appellee, of dates January 22, April 29, and May 31, 1296, respectively, it is said, in part, as follows:

"He was admitted to Baylor Hospital two or three days ago, and an X-ray picture was made by Dr. Martin, which revealed a possible fracture through the os calcis, with no displacement. * * * After reviewing the plate with Dr. Martin, I concluded that the best thing to do for this man was to treat it as a complete fracture, placing foot and heel in a plaster of paris cast, which will probably be necessary for him to wear from three to four weeks. * * * Disability will probably be six or eight weeks."

" * * * I find that there is marked swelling of the tissue of the foot and ankle, with some discoloration of the tissue, and on manipulation he complains of pain in the ankle and instep. * * * Dr. Martin, of Baylor Hospital, made an X-ray plate a few days after the injury and reported a probable fracture of the os calcis. * * * We are of the same opinion as to the condition, and believe that he has developed a traumatic arthritis, which we will probably be able to demonstrate with X-ray plates later on. * * * No doubt this man is going to be disabled for a period of three to six months from date, and it may be possible that he will have some certain per cent. of permanent disability.

"He has been under my care since January, and has had a rather unusual condition, marked swelling of foot and ankle, with discoloration of tissue, and on manipulation of ankle and foot he complains of pain. * * * This is a rather unusual condition and has reacted very unfavorably to any line of treatment which we have outlined. * * * Think it will be 30 or 90 days before he will be able to take up his usual line of duties."

"Several X-ray pictures have been made, and have never been able to find any evidence of fracture; however, the last one we made, a few days ago, showed marked evidence of chronic arthritis, probably traumatic in origin."

We cannot agree with appellant that, by introducing the statements mentioned, appellee has cut himself off from showing by other competent evidence that he had suffered a fracture of his heel bone, and by reason thereof had been totally and permanently disabled.

█ Nor can we agree with the contention made by appellant, by its fourth, fifth, sixth, and seventh propositions, to the effect that the evidence was insufficient to support the finding of the court that there was a fracture of the heel bone, or that such finding was against the weight and preponderance of the evidence, or that the finding that appellee had, by reason of his injury, suffered total and permanent disability, was either unsupported by the evidence or contrary to the weight thereof. We think the evidence—indeed, the preponderance of the evidence—supports both findings complained of by the propositions last mentioned, and the judgment rendered thereon.

Dr. Barnes, Dr. Van Zant, Dr. Bost, and Dr. Plotts, physicians and surgeons, testified in the case for appellee. Dr. Barnes testified that he had experience in examining X-ray plates; that he had been the family physician of appellee, and was familiar with his physical history during such time.

Examining X-ray pictures of appellee's injured foot, made by Dr. Van Zant, Dr. Barnes said: "This picture shows a fracture of the os calcis or calcaneum bone. Here is the line of fracture, running up into the joint. The piece of fracture comes off the cuboid; this piece ought to be way up in here. * * * That fracture runs up toward the joint. It goes into the joint. It is a complete fracture. I mean by a complete fracture, that it is broken completely through. The picture shows that the upper fracture is out of line."

On cross-examination Dr. Barnes testified: "This X-ray picture shows a fracture of the os calcis; this one did, and there are a lot of fragments in there. This one shows some trouble there; * * * both of these [pictures] show a fracture. That fracture runs clear across there, as well as I can see from this. Both of those pictures show a fracture of the os calcis. * * * There looks to be

a fracture in that bone we were talking about a while ago, in these two last pictures. I found the bone in that picture. It has some kind of a fracture in it. The pictures marked 2—17—26, No. 5721, show a fracture of the os calcis, and the picture marked 4—5—26, No. 5059, shows a fracture of the os calcis; it shows a fracture or deformity. It looks like a fracture. * * * He has some fracture and fragments in there that would not let his foot move; it is locking."

On recross-examination Dr. Barnes testified: "There is just a displacement of the upper fragments of this bone. Between several of those joints there is a thickening up, and in one picture it looks to be that some fragments are broke off of the cuboid bone. These pieces usually stay there. In some cases, a deep scar tissue grows around them. That has happened to his foot."

Dr. Barnes, testifying further, said that after appellee received his injury he examined his foot several times, all during the year, and found him tender over the nerves; that in his opinion appellee was suffering from a neuritis of the sciatic nerve; that he had known appellee practically all of his life, and never knew of any sickness he had ever had, or of any fall or injury he had ever suffered; that about six or eight weeks before testifying he examined appellee, and at that time he had trouble with his joint, and had a neuritis from one of the sciatic nerve to the other, presumably caused from his injury; that appellee is disabled in the performance of his usual work 100 per cent. as the result of his injury; that, when appellee had to stand on his injured foot, he could not work; that his disability to perform the work he had been performing would last indefinitely; that he could not tell how long it would last; that it might last a lifetime, and that he thought it would; that he might get well, but he did not think he would.

The effect of Dr. Barnes' testimony was that appellee, Polk, was in his opinion totally and permanently disabled from performing the work for which he was fitted.

Dr. Van Zant, witness for appellee, after stating that he was a physician, limiting his work to X-ray diagnosis and treatment, and was one of the pioneers of X-ray work in the state of Texas, having been engaged in the practice 31 years, testified that he made X-ray pictures of appellee's right foot on March 21, 1927, and found: "An old fracture obliquely through distal end of os calcis extending between the two particular processes. Fragment carrying mesial process is slightly rotated and displaced slightly upward, encroaching on the interosseous space. Healing seems very well progressed. * * * The rotation and displacement of distal fragment of os calcis brought about a faulty position of the joint between the os calcis and the cuboid, and head of astragalus, interfering with free movement, and to a certain extent destroying the integrity of the longitudinal arch of the foot."

Dr. James R. Bost, after stating that he had been a physician since 1911, and that his practice is now confined to specializing in bone and joint surgery, testified that he had examined appellee's right foot, and he had examined X-ray pictures of same with reference to the extent of the fracture of the os calcis. His testimony was as follows: "I diagnosed the condition of his foot as a painful foot, as a result of fractures of four of the bones in the foot, with sciatic neuritis. * * * I examined X-ray pictures of Mr. Polk's foot. These pictures showed injury to four of the bones in the middle of his foot. The bones in his foot that were injured were the os calcis, cuboid, scafoid, and strageles. The os calcis was fractured on the superdistal border. The evidence of fracture, as disclosed by these pictures, was certain. The cuboid was a little cupped out, that was evidently fractured where the bone had been absorbed. The injury to the scafoid was practically the same, and so was the strageles. The injury to the last three mentioned bones can be caused by injury and absorption following. * * * This one [picture] marked 'Right,' that indicates the right foot; I saw it, too. Some of the fractures don't show as clearly as others. This picture shows, but not as clearly as one of these. This one shows all the fractures I testified about. You see that joint comes around there; that part of the bone is broken off and sloped down here. All of the pictures of the right foot show a fracture."

Dr. Cockerham testified that he was called soon after appellee received his injury to render him medical aid; that he did render such aid, and was paid for the same by some insurance company, but he did not remember the name; that he examined the right foot of appellee the night of the day of the accident, and according to his tentative diagnosis he found a fracture of the heel bone.

Dr. Plotts testified that from his examination of appellee's foot he thought there had been a fracture of the heel bone, the os calcis.

In a letter written by Dr. Glass, introduced in evidence, it is said: "After reviewing the plate with Dr. Martin, I concluded that the best thing to do for this man was to treat it as a complete fracture, placing foot and heel in a plaster cast, which will probably be necessary for him to wear from three to four weeks, after which time I have advised him to return to the office for another examination."

Dr. Bost and Dr. Plotts both testified that in their opinion appellee, by reason of his injury, could not perform ordinary tasks of a workman; that he would never be entirely well.

We have quoted and stated the testimony

of the several witnesses at considerable length, so as to show that the contention of appellant, that the findings of the court, complained of are so against the great weight and preponderance of the evidence as to be wholly wrong, is without merit.

For the reasons above expressed, the judgment is affirmed.

Affirmed.