## FIDELITY UNION CASUALTY CO. v. DAPPERMAN.

### No. 3729.

Court of Civil Appeals of Texas. Amarillo.
Jan. 10, 1932.

Rehearing Denied March 9, 1932.

Dorenfield, Foster & Fullingim, of Amarillo, for appellant.

Works & Bassett, of Amarillo, for appellee.

RANDOLPH, J.

This suit was filed by the appellees, as next friends of appellee Dapperman, to recover, under the Workmen's Compensation Law (Rev. St. 1925, arts. 8306–8309 as amended), for alleged injuries suffered by the appellee Dapperman, who is alleged to be now insane. From a judgment in favor of appellees as such next friends, appeal has been taken to this Court.

The plaintiffs' petition alleges, in part, as follows:

"That on and about the 11th day of September, 1929, plaintiff was in the employ of United States Zinc Company, a corporation doing a general smelting business in said Potter County, Texas, and while in the regular course of his employment and in the discharge of his duties in such employment

at the smelter of said company near Amarillo in Potter County, Texas, plaintiff sustained serious and permanent personal injuries as hereinafter more fully set out. That while laboring with and undertaking to operate a cement mixer, his right hand was caught in the machinery of said mixer and crushed and twisted, the second and third fingers of said hand being broken and otherwise injured, for which he has been paid compensation as hereinafter shown. That in addition to said injuries to his hand, his right arm and shoulder were jerked and pulled up, lifting his entire weight thereby, which sprained, wrenched, strained and dislocated the upper portion of his backbone and connections with his neck and neck-joint, said jerking of his said arm and shoulders being sudden and violent and with such force and violence as to disarrange and dislocate the vertebræ of the upper portion of his backbone and neck, causing and producing great nervous shock and strain, pinching and impinging nerves leading to and affecting his eyes, brain and head, all of said injuries being permanent and immediately and directly resulting in the derangement of his mind and producing total and permanent insanity and rendering him totally and permanently incapable of performing any kind of work or service or earning money in any way, all of which proximately resulted from the injuries received by plaintiff as above described.

"That said United States Zinc Company at the time of plaintiff's said injuries carried an insurance policy with and in defendant company for the payment of compensation under the laws of the State of Texas to employees of said Zinc Company including plaintiff, defendant being duly authorized to do, and in fact, doing such business in Potter County, Texas; that after said original injuries of plaintiff and following same, defendant made weekly payments on a basis of 62 days or about 9 weeks in the total sum of $118.06, such payments being with regard to and as compensation for said injuries to plaintiff's said hand and fingers and no other injuries and no other portion of plaintiff's said injuries were compensated or attempted to be paid or covered by such payments, both plaintiff and defendant being at the time of the honest belief that said injuries to plaintiff's said hand and fingers were his sole and only injuries compensable under the Workmen's Compensation Laws of the State of Texas at that time, and said payments were so received by this plaintiff. However, your petitioner further shows that said injuries to his said arm, shoulder, neck, backbone, head, eyes and brain were existing from the time of said injuries on September 11, 1929, but same had not developed to such an extent as to be fully known and recognized by plaintiff, and such injuries were in no sense recognized by defendant or compensated by such

payments, but in truth and in fact his incapacity from each and all of said injuries and especially said injuries to his said arm, shoulder, neck, backbone, eyes, head and brain were running at that time and are still affective without the interference of further injuries or any improper or unsanitary practices on the part of plaintiff, and that said injuries have developed and complications have arisen growing out of and caused by said original injuries which were not foreseen at the time of the receipt of said payments which show that plaintiff and all parties connected with said matter were wholly mistaken as to the extent of plaintiff's injuries and his incapacity. That said developments and complications from said original injuries have immediately and directly resulted in the permanent injury to plaintiff's eyesight and of his total and permanent physical inability to do and perform labor and earn money as before said injuries and especially to do and perform the character and kind of labor that he was then doing and have also immediately and directly resulted in the derangement of his entire nervous system, including the dethronement of his reason producing total and permanent insanity.

"That after the partial development of said last mentioned results of said original injuries and the complications connected therewith, on or about the ——— day of February, 1930, plaintiff filed with the Honorable Accident Board of the State of Texas, application for additional compensation which was further supplemented by additional application filed with said Board on or about the ——— day of March, 1930, wherein he showed said further developments of his said injuries and said complications as affecting his said arm, shoulder, neck, backbone, head, eyes, nerves, etc., and his inability to work on account thereof, which said application and additional application was by said Board, after due notice to all concerned, on the 30th day of September, 1930, considered and a final judgment, order and award made thereon by said Board which was unsatisfactory to plaintiff and with which he was dissatisfied and from which he gave notice of appeal and the filing of this suit as hereinafter shown. That pending said hearing by said Board on, to-wit: about the ——— day of August, 1930, this plaintiff having become so insane as duly adjudged in and by the Honorable County Court of Potter County, Texas, to be so insane and sent to the institution or asylum for the insane at Wichita Falls, Texas, where he has since been and is now confined, after which plaintiff's said next friends intervened in said matter before said Board, and further represented plaintiff's interest therein, and after said final award gave proper notice to said Board on the 18th day of October, 1930, that claimant would not consent to

and was not willing to abide by said final award, judgment and decision and gave notice that he would file this suit in the County where said injury was sustained to set aside said award and obtain the relief to which he is entitled within 20 days from the date of said award and this suit is accordingly so here now brought, and copy of said award with such notice of appeal to the courts will be filed and presented herein for all proper purposes."

There is no question of jurisdiction involved herein, except that the defendant contends that the original claim was settled by approval of the Industrial Accident Board and that the plaintiff's claim for "additional compensation" was not within the jurisdiction of the board. This will be discussed later.

Upon the questions of compensation, the petition alleges as follows: "That plaintiff had been in the employ of said Zinc Company for about two months before his said injuries, drawing only about $4.00 per day for 6 days per week, but that his average weekly wage for the year next preceding his said injuries, while working in the employment in which he was working at the time of his injury, was at least $36.00 per week, or an average daily wage of at least $6.00 per day for a 6 day week; that in event it be determined that he cannot recover upon said basis of an average daily wage of $6.00 per day for the year preceding his said injuries, then he alleges that the average daily wage which employees of the same class, working substantially the whole of such immediately preceding year in the same or a similar employment at the same or neighboring place to that of plaintiff, was at least the sum of $6.00 per day in such employment during the days when so employed, plaintiff's said employment during said year preceding his said accident including said two months while he was so employed by said Zinc Company was that of cement mixer and finisher and that the average daily wage of employees of the same class working substantially the whole of such immediately preceding year in the same or a similar employment in the same or neighboring place to that of plaintiff was at least the sum of $6.00 per day; and at all events, plaintiff asks that said average wage be fairly and justly computed under all the circumstances."

The petition further pleads right to a lump sum settlement.

The defendant's pleadings will be set out as we shall quote or analyze them as we discuss the contentions made by the defendant.

The trial court submitted the case to the jury upon the following special issues:

"Special Issue No. 1.

"(a) Did the plaintiff, L. L. Dapperman, sustain any personal injuries on the 11th day of September, 1929?" Answer: "Yes."

"(b) If so, were such injuries, if any, sustained by the said plaintiff in the course of his employment for U. S. Zinc Company?" Answer: "Yes."

"In connection with the foregoing Special Issue No. 1 (b) you are instructed that the term 'injuries sustained in the course of employment' includes all injuries, if any, of every kind and character having to do with and originating in the work, business, trade or profession of the employer sustained by an employee while in or about the furtherance of the affairs of his employer."

"Special Issue No. 2.

"(a) Did L. L. Dapperman become totally incapacitated for work as a result of such injuries, if any, sustained by him on said 11th day of September, 1929? Answer yes or no.

"(b) If so, at what date did he become totally incapacitated for work? Answer by giving the date found by you.

"If you answer Special Issue No. 2 (a) in the negative, then you need not answer Special Issue No. 3, but if you answer Special Issue No. 2 (a) in the affirmative, then answer:

"Special Issue No. 3.

"Is such total incapacity, if any, permanent? Answer yes or no.

"In connection with Special Issues Nos. 2 and 3, you are instructed that the term 'total incapacity' does not imply absolute inability to perform any kind of labor, but means that one must be so injured that he becomes disqualified for performing the usual tasks of a workman to such an extent that he cannot obtain and retain employment. 'Permanent Incapacity' means such incapacity as will continue through the remainder of one's life.

"If you have answered Special Issue No. 3 in the negative, you need not answer Special Issue No. 4; but if you have answered Special Issue No. 3 in the affirmative, then answer:

"Special Issue No. 4.

"Is this a special case in which manifest hardship and injustice will result to the plaintiff, L. L. Dapperman, if his compensation is not paid in a lump sum? Answer yes or no.

"In connection with this Issue No. 4, you are instructed that you may take into consideration in determining whether or not this is such a special case as to entitle L. L. Dapperman to a lump sum settlement, all evidence, if any, before you with reference to the present condition of the plaintiff, the probability, if any, of the use of such sum, or a portion thereof, for treatment to restore the mind of the plaintiff and the probability, if any, of the money provided by such lump sum settlement, or a portion of said money, being used to a greater advantage to the plaintiff, if paid in a lump sum, than if paid in weekly installments.

"If you have answered Special Issue No. 3 in the affirmative, then you need not answer Special Issues Nos. 5 and 6; but if you have

answered said Special Issue No. 3 in the negative, then you will answer Special Issues Nos. 5 and 6.

"Special Issue No. 5.

"State the number of weeks, if any, of L. L. Dapperman's total incapacity, if any, to work as a result of the injuries, if any, sustained by him on September 11th, 1929. Answer by stating the number of weeks found by you.

"Special Issue No. 6.

"(a) Has L. L. Dapperman sustained partial incapacity for work as the result of the injuries, if any, sustained by him on September 11th. 1929? Answer yes or no.

"(b) Will the said L. L. Dapperman be partially incapacitated for work in the future as the result of his said injuries, if any? Answer yes or no.

"If you have answered Special Issues 6 (a) and (b) above, or either of them, in the affirmative, then answer:

"(c) Is such partial incapacity, if any, for work, permanent, as the word permanent has been defined in connection with Special Issue No. 3? Answer yes or no.

"If you have found that the plaintiff was partially incapacitated for work by reason of his said injuries, if any, but that said partial incapacity, if any, is not permanent, then answer:

"(d) State the number of weeks, if any, of such partial incapacity, if any, for work. Answer by stating the number of weeks of such partial incapacity, if any, whether such partial incapacity, if any, has already passed or will continue to some future time.

"(e) Fix the percentage of plaintiff's partial incapacity, if any, for work. Answer by stating the percentage found by you, based upon an average for the entire time of such partial incapacity, if any.

" 'Partial incapacity' as used above is defined as meaning that one who has been injured is able to perform a substantial part, but not all, of his regular labor or employment, or of some other occupation, labor or employment, with which he is familiar; but that he is not able to perform all of such labor or such other occupation or employment with which he is familiar.

"Special Issue No. 7.

"(a) Had the plaintiff, L. L. Dapperman, worked in the employment in which he was working at the time of his injuries, if any, substantially the whole of the year immediately preceding such injuries, if any? Answer yes or no.

"If you answer Issue 7 (a) above in the affirmative, then do not answer Issue 7 (b); but if you answer said Issue 7 (a) in the negative, then you will answer:

"(b) Were there employees of the same class as the plaintiff, L. L. Dapperman, working substantially the whole of the year immediately preceding September 11th, 1929, in the same or in a similar employment as the plaintiff was engaged in, in Amarillo, Texas? Answer yes or no.

"Special Issue No. 8.

"What was the average weekly wages being earned by the plaintiff, L. L. Dapperman, at the time of his injury, if he was injured? Answer by stating the amount found by you.

"In connection with Special Issues Nos. 7 and 8, you are instructed that if you answer Special Issue No. 7 (a) in the affirmative, then you will arrive at the plaintiff's average weekly wages by taking 300 times the average daily wage, or salary, which he was earning in his employment during the days when so employed, whether for the same employer or not, and divide the sum thus ascertained by 52.

"If you answer Special Issue 7 (a) in the negative, and 7 (b) in the affirmative, then you will arrive at the average weekly wages of the plaintiff by taking 300 times the average daily wage, or salary, which an employee of the same class, working substantially the whole of such immediately preceding year in the same or in a similar employment, in Amarillo, Texas, shall have earned in such employment during the days when so employed, and divide the sum thus ascertained by 52.

"If you answer Issue 7 (a) and (b) both in the negative, then you will arrive at the average weekly wages of the plaintiff in any manner which may seem to you just and fair to both the plaintiff and defendant.

"Special Issue No. 9.

"Were plaintiff and defendant mistaken as to the extent of plaintiff's injuries, if any, and incapacity, if any, at the time the receipt of payment, dated November 14, 1929, was issued by the defendant and accepted by the plaintiff? Answer yes or no.

"If you answer Special Issue No. 9 in the affirmative, you need not answer Special Issue No. 10; but if you answer Special Issue No. 9 in the negative, then you will answer:

"Special Issue No. 10.

"Was the plaintiff mistaken as to the extent of his injuries, if any, and incapacity, if any, when he accepted the payment and signed the receipt dated November 14th, 1929? Answer yes or no.

"Special Issue No. 11.

"(a) Did the plaintiff's condition change to the worse after November 14, 1929? Answer yes or no.

"(b) If so, did such changed condition result from the injuries, if any, sustained by the plaintiff on September 11, 1929? Answer yes or no.

"Special Issue No. 12.

"If you answer Special Issue No. 4 in the affirmative, then state what would be a fair and reasonable annual rate of discount upon money which might be paid to the plaintiff in a lump sum in advance of the ordinary weekly due dates thereof, considering the use, value and advantage, if any, of such lump sum payment. Answer by stating the percentage found by you."

The appellant's first proposition is that a judgment cannot be based upon an issue which affirmatively appears to be contrary to the uncontroverted evidence. This is made to apply to issue No. 7 submitted by the court to the jury.

■ Appellees' counsel admits in the oral argument that as to this issue it is "probable" that there is insufficient evidence to support it. We are of the opinion that the defendant's first proposition is correct and we sustain it without further discussion. But, this being true, is the judgment supported, as appellees contend, by issue No. 8 and the jury's findings thereunder—that the weekly wage being earned by the plaintiff L. L. Dapperman at the time of his injury was $23.10.

It will be observed that issue No. 7-a was answered by the jury in the affirmative, which issue and answer we have held not to have been supported by the evidence. Issue No. 7-b was not answered by the jury under the direction of the court, and the jury, having answered issue No. 7-a and not answered 7-b, furnished no basis for any judgment.

Article 8309, R. C. S., section 1, subdivisions 1, 2 and 3, provide as a measure of compensation as follows:

" 'Average weekly wages' shall mean:

"1. If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same employer or not, substantially the whole of the year immediately preceding the injury, his average annual wages shall consist of three hundred times the average daily wage or salary which he shall have earned in such employment during the days when so employed.

"2. If the injured employee shall not have worked in such employment during substantially the whole of the year, his average annual wages shall consist of three hundred times the average daily wage or salary which an employee of the same class working substantially the whole of such immediately preceding year in the same or in a similar employment in the same or a neighboring place, shall have earned in such employment during the days when so employed.

"3. When by reason of the shortness of the time of the employment of the employee, or other employee engaged in the same class of work in the manner and for the length of time specified in the above subsections 1 and 2, or other good and sufficient reasons it is impracticable to compute the average weekly wages as above defined, it shall be computed by the board in any manner which may seem just and fair to both parties."

The first two methods were considered by this court in the case of Federal Surety Co. v. Shigley, 7 S.W.(2d) 607, 609. Under the evidence and findings of the jury, there is no basis for the court's judgment as provided in subdivisions 1 and 2 and stated above. Under the third subdivision, it is provided that when by reason of the shortness of time of the employment in the manner and for the length of time, or other good and sufficient reasons, it is impracticable to compute the average weekly wages as above defined, it shall be computed by the board in any manner which may seem just and fair to both parties. In the plaintiff's petition, the following allegation is made upon this basis: " * * * And at all events, plaintiff asks that said average wage be fairly and justly computed under all the circumstances."

It will be remembered that the plaintiff's petition alleges the first and second subdivisions upon which to compute the measure of plaintiff's compensation, as well as this allegation in compliance with the third subdivision.

Under the first subdivision, there is no sufficient evidence to sustain the jury's finding. The second was not answered by the jury. The third has produced the contention of plaintiff that it is sufficient with the jury's finding upon which to base the judgment of the court.

The plaintiff further insists and alleges that the judgment can be and is sustained by the fact that "the defendant has made payment of the amount of $118.06 in weekly payments on a basis of 62 days or about 8 weeks in the total sum of $118.06, such payments being with regard to and as compensation for said injuries to plaintiff's said hands and fingers and no other injury," etc. The jury did not answer special issue No. 5, asking them to find the number of weeks of plaintiff's incapacity. In answer to special issue No. 8 as to what was the average weekly wage of plaintiff at the time of the injury, the jury gave such weekly wage.

In the case of Texas Employers' Insurance Ass'n v. Bateman, 252 S. W. 339, 340, the Dallas Court of Civil Appeals says:

"To provide a basis of compensation for injured employees under any circumstances which may surround cases of injuries, three different means of ascertaining average weekly wages are provided in the statute. The first is that, if the injured employee shall have worked in the employment in which he was engaged at the time of the injury substantially the whole of the year immediately preceding the injury, his aver-

age annual wages shall consist of 300 times the average daily wage or salary which he shall have earned in his employment during the days when he was so employed. The second is that, if the injured employee shall not have worked in such employment during substantially the whole of the year, his average annual wages shall consist of 300 times the average daily wage or salary which an employee of the same class working substantially the whole of such year immediately preceding the injury in a similar employment in the same or a neighboring place shall have earned in such employment during the days when he was so employed. The third statutory method of fixing compensation provides that, when by reason of shortness of the time of employment before the injury of the employee, or of another employee engaged in the same class of work in the manner and for the length of time specified in the first and second statutory bases of ascertaining average weekly wages as above stated, or for any other good and sufficient reason, it is impracticable to compute the average weekly wages as provided in these two directions, then the computation may be made in any manner which may seem just and fair to both parties.

"Since the jury found that appellee did not work substantially the whole of the year immediately preceding his injury, and since there is no proof that any other employee did the same kind of work in the same or similar employment in the same place, or a neighboring place, during substantially the whole of the preceding year, and no proof of what any other employee received for similar labor done there, we think the court was justified in submitting to the jury the issue above set forth and against which complaint is made. The issue as submitted comprehended substantially the statutory direction for computing the average weekly wages, and we are not prepared to say that the record did not justify it as a proper issue to be determined by the jury. The evidence can be said to sustain the finding made. The proof showed that the plant was closed down for a considerable period of time during the preceding year; it showed that appellee was employed by the hour, and that he received 35 cents per hour when he was actually engaged at work. The amount paid him on this basis during different months ranged from $110.40 to $5.40. The evidence, beyond the fact that the plant was not in operation, as above stated, does not account for these variances, or for appellee's failure to work steadily and receive substantially the same amount each month he worked."

It has been held that the making of partial weekly payments at a given rate of compensation is an acquiescence in the fact of the issuance of a policy by a compensation company. Georgia Casualty Co. v. Ginn (Tex. Civ. App.) 272 S. W. 601; Independence Indemnity Co. v. Polk (Tex. Civ. App.) 14 S.W. (2d) 330; Barron v. Texas Employers' Insurance Ass'n (Tex. Com. App.) 36 S.W.(2d) 464, 465. The rule laid down as to proof of the issuance of a policy has been applied by this court to the question of proof of weekly wage. In the case of Texas Employers Insurance Association v. Beckworth, 42 S.W. (2d) 827, 831, this court holds: "It has been held that even where a plaintiff had failed to plead and prove an average weekly wage of $18.75, he sufficiently pleaded and proved the average weekly wage of $16.37, for the reason that he did plead and prove the payment by defendant of weekly payments in checks of $16.37. In the case at bar, the defendant pleaded the payment of the sum of $650 by it to the plaintiff, and it was shown by the evidence that such sum was based upon a weekly wage payment of $19.04. We therefore hold that the defendant had recognized the weekly wage to be as claimed by the plaintiff, and overrule this contention of the defendant."

We therefore hold that issue No. 8 and the jury's answer thereto furnished a sufficient basis for the trial court's judgment.

Appellant's second proposition is that, where an association acknowledges its liability as a compensation insurance carrier and makes payments thereunder, and thereafter makes a settlement with the employee, who executes a settlement receipt to the association, acknowledging payment of a certain sum in full settlement of compensation under the Workmen's Compensation Act, for all injuries sustained by him, and such settlement receipt is filed with the Industrial Accident Board, the money paid constitutes a bar to every further claim on the part of the injured employee in the absence of fraud, accident, or mistake, and the employee is not entitled to recover additional compensation on the sole ground of a change in his condition after such settlement.

The plaintiff in his petition as above quoted, after setting out the plaintiff's injuries at length, says: "And that said injuries have developed and complications have arisen growing out of and caused by the original injuries which were not foreseen at the time of the receipt of such payment which show that plaintiff and all parties connected with said matter were wholly mistaken as to the extent of plaintiff's injuries and his incapacity. That said development and complications from said original injuries have immediately and directly resulted in the permanent injury to plaintiff's eyesight," etc.

The original settlement receipt was duly filed with the Industrial Accident Board, but no express approval by that board is shown in the record. However, the record from the Industrial Accident Board shows that,

after permitting the plaintiff to file his supplemental claim for compensation, the board overruled said claim and sustained the defendant's plea of settlement as evidenced by the settlement receipt. The plaintiff appealed from this decision of the board and filed his suit de novo in the district court by way of an appeal therefrom. The petition we have been discussing was filed in said de novo proceedings.

■ The rule invoked by the defendant that the execution of the receipt of settlement cannot be attacked, except fraud, accident, or mistake can be shown, is the recognized rule in force upon such questions. But, we do not understand that fraud, accident, and mistake must concur in order to permit such attack. The rule is that, if either fraud, accident or mistake is pleaded and proved, such instrument may be set aside.

■ The plaintiff's pleading is sufficient to present the question of mistake to the trial court.

"When the immediate result of a personal injury to an employee is apparently slight, so that she elects not to present a claim for compensation, and later on serious results caused by the injury come into existence, it may be found that failure to claim compensation within six months of the injury was occasioned by 'mistake,' within Workmen's Compensation Act, pt. 2, § 23, as added by St. 1912, c. 571, § 5, providing that failure to make claim within six months shall not bar proceedings under the act if occasioned by mistake. In re Carroll, 114 N. E. 285, 287, 225 Mass. 203." 5 Words and Phrases, Third Series, 172, 173.

"Failure of compensation claimant to give notice for four months of hernia caused by strain, held, under circumstances showing that at time of injury claimant regarded it as trivial and that notice was given immediately when seriousness of injury became apparent, due to 'mistake,' within Workmen's Compensation Act (Laws 1919, c. 238) § 20, and not to prevent recovery of compensation, under section 17. 'Mistake' which under Workmen's Compensation Act (Laws 1919, c. 238) § 20, excuses workman's failure to give notice of injury required by section 17, does not mean mistake of law but mistake of fact, which takes place either when some fact which really exists is unknown or some fact is supposed to exist which really does not exist. Brackett's Case, 138 A. 557, 558, 126 Me. 365." 5 Words and Phrases, Third Series, 173.

Article 8306, § 12d, R. C. S., provides: "Upon its own motion or upon the application of any person interested showing a change of conditions, mistake, or fraud, the board at any time within the compensation period may review any award or order, ending, diminishing or increasing compensation previously awarded within the maximum and minimum provided in this law, or change or revoke its previous order, sending immediately to the parties a copy of its subsequent order or award. Review under this section shall be only upon notice to the parties interested."

■ It will be seen that the board is vested with power to take cognizance of any mistake made by the claimant in the presentation of his original claim to them. The board having this power, a trial de novo in the district court, that court is also vested with the jurisdiction to determine such question.

■ It is useless for us to set out the evidence at great length, but it suffices to say that the facts and circumstances in evidence present a sufficient basis for the court to render a judgment upon the ground of the plaintiff's being mistaken as to the extent of his injuries when he signed the settlement receipt.

The plaintiff called Dr. E. R. Carpenter as an expert witness, and his qualifications were admitted. The witness first saw the plaintiff in the insane asylum at Wichita Falls the early part of April, 1930, and talked with him about three hours, examining him with reference to his mental condition, and found that he was very "definitely" insane.

After describing plaintiff's condition, the witness was asked a hypothetical question as follows: "Q. Now, doctor, bearing in mind your examination of this boy and what you observed of him, and what you developed from him, assuming that on September 11th, 1929, his right hand was injured by being caught between two substances and mashed across the back until it was laid open right across the back of the hand and two of the bones fractured; that wound requiring treatment and being placed in a splint and kept in the splint for about four weeks, being treated at intervals, and then released for a while, and replaced in the cast for another week or ten days, after which the hand seemed to have gotten substantially well; that this wound was inflicted when the hand was elevated to about seven feet above the ground and was caught between these boards, or substances, with such force as to require two men with a 2x6 to prize them apart and release him, his hand remaining in that hold for something like three minutes, some such time as that, when he was released and taken from that position; that, before this time, he was a normal boy, healthy, stout and active, about 21 years of age, doing work frequently, apt, doing his work reasonably well and appearing to be dependable and nothing abnormal or irregular observed or noticed in his mental actions or conversation; but immediately after this occurrence, within about a week, something like that, he was noticed to make some observation, believing that there was blood dripping from his bed and,

from that on, his conversation was stated to be strange, absent-minded, forgetful, and his body was unable to work—he went back to work for a few days, and, apparently, wasn't able to continue—until he quit the work, and then he tried to do other things, the testimony showing that he would make an effort and not be physically able to pursue it; he would be sent to attend to a matter and then would ask about what he was to do and come back to find out about it; and went to buy groceries, and after he would have the order filled he would then want it filled again and had apparently forgotten that it had been filled; he was observed to say that his mother wasn't his real mother, and that some woman had killed herself over him, and different things along those lines until finally, in August of the following year, he is shown by the testimony to have become insane. In the meantime, in about February of that year, about four or five months after the injury, his eyes were tested and the doctor finding the vision impaired and some disturbance of the nerves and the structure of the eyes; and, after he was adjudged insane, he was sent to the asylum where you found him; the testimony showing that about the time, or, at least, at the time that the testimony shows that he was insane about the first of August, that the doctor examining him found a tenderness and soreness about the base of the brain. Now, doctor, assuming the history and those facts to be substantially shown, what would you say as to whether the injury, as described, caused, or produced, his mental state? A. There is no question it did."

Counsel for appellant then made the objection to the hypothetical question asked, for the reason that that part of the question "assuming that it is shown that Dapperman was insane," and further to that part of the hypothetical question which states that the testimony shows that Dapperman was insane, for the reason that it invades the province of the jury and being a hypothetical question which states that the testimony shows that Dapperman was insane, for the reason that it invades the province of the jury and being a hypothetical question on a conclusion as to what the testimony shows.

Counsel for plaintiff then stated: "I will change the form of it to assuming that he was insane in August, 1930."

Counsel for defendant then said: "He must state the fact as to what the testimony shows—relate the facts—without assuming that those facts show him to be insane. Now, we submit that any assumption by counsel as to what the facts show invades the province of the jury, and the hypothetical question isn't proper."

The court then said: "Well, I don't recall what Dr. Johnston's testimony was."

Counsel for both sides agreed that Dr. Johnston said he (plaintiff) was crazy, and the court then overruled the objection.

Counsel for the defendant then said: "We have this further objection, Your Honor, please: part of it is all right, but we further object to the statement that the testimony shows, and assuming that the testimony shows, that Dapperman was not able to work within a week or so following the accident, or the time when he was discharged by Dr. Aronson and his hand removed from the splint. We object to that part of the question for the reason that it invades the province of the jury. That question is to be determined by the jury, whether he was or wasn't able to work, and assuming that the testimony shows he wasn't able to work invades the province of the jury."

The following question was asked and proceedings had:

"Q. Did what? A. There would be no question. I am taking into consideration what I know about the case, too.

"Mr. Foster: We ask that his answer go out because it is shown that the witness isn't answering the question predicated upon the facts stated in the hypothetical question, but it is predicated upon other matters within the knowledge of the witness which have not yet been disclosed by the testimony.

"The Court: That objection is well taken. Just answer the question. The hypothetical question should be answered—just that question.

"Mr. Works: It is called a hypothetical question, but a man is entitled to what he knows and found out by his own examination, and I properly asked him to consider in connection with what he stated he found. It is a combination of a hypothetical question and fact question.

"The Court: I will state, even while you might be right there, the witness cannot take into consideration what anybody else has told him, but only what he found out with reference to the patient himself.

"Q. Bearing in mind your examination and what you observed and learned for yourself, excluding anything that anybody might have told you, you understand, now: and then assuming the hypothesis, or history, of the case that I outlined, what would you say as to whether or not the injury caused his present condition?

"Mr. Foster: If Your Honor please, we object to that for the reason it would invade the province of the jury; that it is based upon facts not yet disclosed by this testimony. Now, he says what he knows about it. Now, in putting his hypothetical question, he would have to confine him to just exactly what he has testified to.

"Mr. Works: In view of the objection, I will limit it this way:

"Q. Considering, now, only such matters as you have explained to the jury or in your testimony that you found, and the examination you gave him, and just the matters that you have related to those men, taking just the facts only in connection with the history of the case and the hypothetical question I propounded, what do you say?

"Mr. Foster: We object to that as invading the province of the jury, for this reason: Now, he is asking him to take into consideration all of the matters about which he has already testified, and then he wants him to give his extra opinion, based upon these matters, in connection with the other facts stated in the hypothetical question and then asked him to state, based upon that, whether or not so and so is true. Now, it is for the jury to determine that matter, and he can't invade the province of the jury by stating his own proposition and then giving it as his opinion that it is true. That is for the jury to determine.

"The Court: I will overrule the objection.

"Mr. Foster: Note our exception.

"Mr. Fullingim: We want to further object to the question, if it please the Court—to the witness' answer to the question—for the further reason that the hypothetical question takes into consideration evidence which is not before the Court at this time, and it is basing the hypothetical question on evidence not before the Court at this time.

"The Court: I will overrule the objection.

"Mr. Fullingim: Note our exception.

"Q. Now, doctor, you may answer. A. I would like to make an explanation.

"Mr. Foster: Just let him answer the question.

"Q. Just answer. You started to answer. A. Basing my knowledge on what I know of the man and what you have told me in connection with the explanation you have made of how these things happened, I would say the injury was undoubtedly, directly or indirectly, the thing that produced the trouble he now has.

"Mr. Foster: We ask that be stricken, because it is clearly shown that it is based upon facts not in evidence and it is not confined to the matters and things about which he has already testified. What he knows. Now, how do we know what he knows about this matter?

"The Court: I will overrule the objection.

"Mr. Foster: Note our exception.

"Q. Now, doctor, eliminating from the question, without taking the time—I won't repeat the history and the hypothetical question that I have submitted; and eliminating from your consideration, for the purposes of this question, anything that you might know or have learned from your own examination, but just taking the history of the case as I gave it to you in the hypothetical question,—you understand now the way I limit the question: Eliminating, and just forgetting for the purpose of this question that you ever saw the boy or talked to him or learned anything about him yourself, but I want to submit to you as a purely hypothetical question the history as I related it to you—A. As you have related it?

"Q. Yes sir; then what would you say as to whether that injury, as shown in that hypothetical question, caused, or, at least, contributed to causing, the condition? A. I wouldn't like to express an opinion on anything that I couldn't exercise my own judgment about; I have to have a reason to express it, and I have to know something about it before I could express an opinion on what somebody else said; I have a definite opinion in this case, and I have stated it as plainly as I can state it."

We have stated the whole of the proceedings as it is only by a process of elimination that we can arrive at the question really asked of the witness.

It must be remembered that the real question at issue was not the present insanity of the plaintiff, but was the causal connection between the accident which happened to him and such present insanity. This being true and the defendant in its cross-examination having developed that the expert witness had testified that he had only examined the plaintiff one time, and that only for about 2½ hours, that he had never seen the plaintiff again, and that it was entirely possible for Dapperman to have been in the condition in which the witness found him without his ever having received any injury; witness also testified that his examination simply told him that the plaintiff was insane.

The following testimony was also elicited from the witness:

"Q. I understand that. Your examination of Dapperman simply told you he was insane? A. Insane, yes sir.

"Q. But it didn't tell you why he was insane, did it? A. No, certainly not.

"Q. Now, do you say that he is insane by reason of the injury? A. Taking the man, the history of him—

"Q. Just answer the question yes or no. A. Yes sir, he is insane from the effects of the injury.

"Q. You say from the effects of the injury; it was some one else that told you about the injury, wasn't it? A. Why, certainly.

"Q. And it wasn't Dapperman, was it? A. He didn't know enough to tell me, no sir.

"Q. So your opinion that he is insane from

an injury is based upon what somebody else has told you about his injury? A. Certainly."

Based upon the conclusions of fact from the evidence given by this expert, we find that this witness knew nothing and testified to nothing which showed a causal connection existing between the accident to the plaintiff and his insanity.

■ It is also clear that the witness did not answer the hypothetical question upon the facts stated and his examination, but that he was relying upon what some one had told him with reference to the injury to plaintiff, in part. Hence the trial court erred in permitting the evidence to go to the jury. .

■ While an expert witness is not confined to facts within his own personal knowledge, but may give an opinion upon facts assumed for the purpose of the question, the question should be so framed as to fairly and clearly present the state of facts which the testimony tends to prove.

The substance of the question must have a direct and intimate connection with the testimony in the case, else the jury might be misled and the very purpose of the evidence defeated. 2 Jones on Evidence (1st Ed.) 900, 901.

"Hypothetical Questions: (a) In General.

"Assumption of facts in putting a question may be regarded as a test of whether a witness is being examined as an expert. . The expert, properly so called, is asked what would be his judgment upon all or any prescribed part of the facts, as to which evidence has been lawfully received, or which have been admitted, assuming that they are true; provided that a sufficient number of facts are assumed to enable the witness to give an intelligent opinion. The witness having no facts in mind as the result of observation, it is in this way alone that a proper basis for a reasonable judgment can be furnished, and the witness cannot add to the hypothetical questions facts within his own knowledge and not in evidence. The requirement that the question should be in the hypothetical form, stating facts of which there is some evidence in the case, continues throughout the examination of the expert, so far as the attempt to elicit affirmative facts is concerned, and applies equally to cross-examination as to direct, and to the redirect as to the original case. Different hypotheses may be submitted to the witnesses for different parties, provided the facts embraced in each hypothesis have some support in the evidence, but where a party's contention merely denies the truth of his opponent's position, no basis for a hypothetical question is furnished." 22 C. J. 706, 707, 708.

See, also, Raub v. Carpenter, 187 U. S. 159, 23 S. Ct. 72, 47 L. Ed. 119, 123.

Our discussion of the assigned errors con-sidered by us in this opinion determines others related thereto, but, when not so related and determined, such assignments are overruled.

For the error of the trial court in permitting the expert witness to testify, when it appears he was testifying in part from what others had told him of the injuries to the plaintiff, we reverse the judgment of the trial court and remand the case for a new trial.