## HUNT et al. v. ISOM.
## No. 3114.

Court of Civil Appeals of Texas. El Paso.
Jan. 10, 1935.

Everette B. Parks and Baskett & De Lee, all of Dallas, for plaintiffs in error.

Albert S. Jackson, of Dallas, for defendant in error.

PELPHREY, Chief Justice.

On May 23, 1932, Mrs. Pearl Williams, a widow, conveyed to T. W. Hunt, a single man, 17.41 acres of land out of the J. C. Reed, Stephen P. Montgomery, and Jesse Moon surveys in Dallas county, Tex. The consideration paid and agreed to be paid was $5,000; $3,500 in cash, and three notes for $1,000, $300, and $200, respectively. The $1,000 note was payable in installments of $25 per month, while the others were due in two and three years from date. The notes were secured by a vendor's lien on the property and also by a deed of trust in which George W. Price was named as trustee. The lien securing the $300 and $200 notes was made secondary to that securing the $1,000 note.

The $1,000 note was transferred, without recourse, by Mrs. Williams to defendant in error. The deed of trust executed by Hunt contained the following provisions: " * * * But if default shall be made in the payment of said note, or any of them, or of any installment of interest thereon, when due, or in case of the breach of any of the agreements or covenants herein mentioned, then the said trustee, or his successor in this trust, shall be, and is hereby authorized and empowered, when requested to do so by the holder of said note, or any of them, after such default, to sell the said property, in whole, or in lots or parcels as to him shall seem expedient, at public auction for cash, between the hours of 10 o'clock A. M. and 4 o'clock P. M. on the first Tuesday in any month at the door of the County Court House of the County where said real estate is situated, after first posting written notice thereof for three consecutive weeks prior to the day of sale in three public places in said County, one of which shall be at the door of said Court House, and after such sale to make to the purchaser or purchasers thereof a good and sufficient deed in fee simple to the premises sold, binding myself and my heirs, executors and administrators by the usual covenants and warranties; and any statement or recital of facts in such deed as to the non-payment of the indebtedness hereby secured, the existence of such indebtedness, notice by advertisement, sale, the receipt of the money, * * * shall be prima facie proof of such statement or recital; * * * "

On June 6, 1933, at the request of defendant in error, the trustee made a sale of the property under the deed of trust. Defendant in error bid in the property for $700, and the trustee executed a deed to him therefor. The trustee's deed contained the following recital:

"Whereas, default was made in the payment of the past due installments on the note described in and secured by said deed of trust, being the first vendor's lien therein described, and the holder of said note exercised his option set out in said note and declared all of said note due, and payment of said note and of the matured installments thereon, and the accrued interest thereon, still being in default; and payment thereof having been refused, the owner and holder of said note, after said default, requested me, the said trustee, to advertise and sell said property in accordance with the provisions of said deed of trust for the purpose of satisfying said in-

debtedness, and at the special request of the legal and equitable owner and holder of said note I did advertise for sale the property described in said deed of trust in the manner and for the length of time required and prescribed by said deed of trust; and

"Whereas, pursuant to said request and to the provisions of said Deed of Trust, I proceeded to sell said property at public auction, at the Court House door of Dallas County, Texas, between the hours of ten o'clock A. M. and four o'clock P. M. on Tuesday, the 6th day of June, A. D. 1933 (being the first Tuesday in June, 1933) after having given public notice of the time, place and terms of such sale, as required by the terms of said Deed of Trust, and after having given notice of the time, place and terms of said sale in the manner and for the length of time required and prescribed by the Revised Statutes of the State of Texas for sales of real estate under deeds of trust. * · * * "

On July 7, 1933, defendant in error filed this suit against T. W. Hunt and Mrs. Williams. The first count in his petition was in trespass to try title, and in the second count in the alternative that if he was not entitled to recover the property and damages under the first count that he have judgment for his debt and for foreclosure of his lien. Plaintiffs in error answered by a general demurrer, plea of not guilty, a general denial, and specially pleaded that the property had been sold by Mrs. Williams to Hunt; that the three notes had been executed by him; that the $1,000 note had been sold by Mrs. Williams to defendant in error, and the second lien securing the $300 and $200 had been retained by her; that before purchasing the property Hunt had arranged to borrow $900 from defendant in error out of which he paid Mrs. Williams $300 on the purchase price of the land and used $600 thereof in making improvements on the property; that it was agreed by all parties that the $1,000 note should be executed by Hunt to Mrs. Williams and by her transferred to defendant in error to secure him for the $900 loan; that defendant in error had at all times been cognizant of Mrs. Williams' interest in the property by virtue of the ownership of the $300 and $200 notes; that in August, 1932, after Hunt had defaulted in the payments on the $1,000 note, defendant in error agreed to not then declare the note due and foreclose his lien, but that he would give Hunt an opportunity to obtain · the money with which to make the payments; that he would not post and sell the property until he had to do so; that he would wait as long as he could; that by reason of such statements

and conduct defendant in error impliedly promised plaintiffs in error, and thereby caused them to believe, that he would notify them before foreclosing his lien, thereby giving them, and particularly Mrs. Williams, an opportunity to protect her interest in the property; and that by reason of such acts and statements defendant in error was estopped to sell the property under foreclosure without notifying plaintiffs in error of his intention so to do.

They further pleaded that the $700 for which the property sold was a grossly inadequate price, and that the sale was not advertised by posting notices thereof at three public places for full twenty days prior to the sale as required by the deed of trust and by law. .

Hunt further pleaded the Moratorium Act and prayed for a postponement of the suit by virtue thereof.

In a supplemental petition defendant in error alleged the value of the property to be $1,-750; denied that the sale had been made for a grossly inadequate price; and asserted the unconstitutionality of the Moratorium Act.

Trial was had before the court, and judgment rendered for defendant in error for the title and possession of the property, and for rents in the sum of $27.50.

This appeal is from such judgment.

### Opinion.

█ In their three assignments of error plaintiffs in error attack the judgment on the ground that the trustee's deed under which defendant in error claims is void because the notices of the trustee's sale were not posted in three public places in Dallas county, and because they were not notified of the sale by defendant in error.

It is provided in the deed of trust that a statement or recital in the trustee's deed as to notice by advertisement should be prima facie proof of such statement or recital. The trustee's deed recited that sale had been made after having given public notice of the time, place and terms thereof, as required by the deed of trust and by the statute.

The introduction of the trustee's deed established, prima facie, that all requirements of the law had been observed, including the posting of the necessary notices. Adams v. Zellner, 107 Tex. 653, 183 S. W. 1143. This would support the judgment as far as the question of posting is concerned, in the absence of any evidence showing that proper notice had not been given. „

■■ The trustee, as to the posting of notices, testified that he posted three notices; one east of White Rock on the Garland road, a public highway, one on the courthouse door, and one on a pecan tree on the Fort Worth-Dallas Highway. The term "public place," within the meaning of a statute requiring the posting of a notice therein, is relative, 46 C. J. § 74, p. 560; 2 A. L. R. 1008, notes, and is a question partly of fact and partly of law. 2 A. L. R. 1008, supra.

This being true, we cannot here say that, as a matter of law, the posting of the notices on a post or sign post and a pecan tree by the side of a public highway was not posting in a public place. The contention to that effect made by plaintiffs in error must be overruled. See Kent v. National Supply Co. of Texas (Tex. Civ. App.) 36 S.W.(2d) 811.

■ Nor can we agree with the position taken by plaintiffs in error as to defendant in error being estopped to have the property sold under the deed of trust without notifying them of such sale.

Defendant in error testified as follows as to the facts relative to his delay in having the property sold:

"Q. The installments maturing in August and thereafter were not paid. Is that correct? A. Yes, sir.

"Q. What conversations did you have with Mr. Hunt with reference to paying these payments that were in default, if any? A. We had several different conversations, that is, at different times that I saw him.

"Q. How many times did you see him? A. Well, I seen him something like ten or eleven; that is, I saw him every month, that is, when a payment or a new note came due.

"Q. Well, did you make any demand on him for the money? A. Yes, sir.

"Q. Did you ever make any statement to him with reference to foreclosure? A. Yes, sir.

"Q. When? A. Well, it was along in the winter. I don't remember what month; early spring.

"Q. Last winter? A. Yes, sir.

"Q. What did you tell him? A. I told him that I would have to have my money and if I didn't get it I would be forced to foreclose on the land.

"Q. Did you notify him that all of the note was due by reason of the default in those payments? A. Yes, sir.

"Q. Make a demand on him for it? A. Yes, sir.

"Q. And you told him if it wasn't paid you would have to foreclose? A. Yes, sir.

"Q. Did he ask for an extension of the note or what did he say? A. What did he say? He just said he didn't have the money.

"Q. Did he ever request you to give him any notice in the event of foreclosure? A. No, sir.

"Q. Did you ever tell him you would send him notice of it? A. No, sir.

"Q. Did you ever talk to Mrs. Williams about it? A. Yes, sir.

"Q. How many times did you talk to her about it? A. I really don't know; something like three or four, I imagine.

"Q. Did you ever tell her Mr. Hunt was in default? A. Yes, sir.

"Q. And that the whole note was due? A. Yes, sir.

"Q. Did you ever tell her you were going to foreclose it? A. Yes, sir.

"Q. Did she ever request you to give her personal notice in the event you were going to foreclose it? A. No, sir.

"Q. Did you ever tell her you would do so? A. No, sir.

"Q. When was the last time you talked to her about it, do you remember? A. Well, it was some time before I foreclosed on it; I don't remember just the time it was.

"Q. Do you remember where it was? A. Well, I think I told her up there twice. I told her down here once and then I phoned her once.

"Q. Phoned her? A. Yes, sir.

"Q. And where was she when you phoned her? A. She was in Oak Cliff.

"Q. Did you call her up over the phone? A. Yes, sir.

"Q. Or did anyone call her for you? A. Yes, Mr. Lancaster called her for me.

"Q. He got her over the phone? A. Yes, sir.

"Q. You talked to her? A. Yes.

"Q. What did you tell her? A. I was in his office and asked him to call that number.

"Q. You were in his office and asked him to call that number? A. Yes.

"Q. Did you recognize her voice? A. Yes.

"Q. What did you tell her during that conversation? A. I asked her if she was going to be able to get me some payments on that note and she said she wouldn't.

"Q. She said she wouldn't? A. She wouldn't be able to make any of them.

"Q. Did you say anything about foreclosure? A. I told her if her or Mr. Hunt didn't take care of it I would have to foreclose on the land.

"Q. Did she request you at that time to give her any personal notice on it? A. Not at the time; no.

"Q. Did she request you to give any extension of it? A. She did last winter, last fall.

"Q. Did she during the telephone conversation? A. No.

"Q. She didn't request any extension? A. No.

"Q. Just told you she couldn't take care of it? A. Yes, sir.

"Q. When was it she requested extension? A. Which?

"Q. When was it she requested extension? A. That was last winter.

"Q. Did she request any definite extension? A. No, sir.

"Q. What kind of request did she make? A. She asked me, that is, to give them all the time I could on the payment of these notes and I told her that I would.

"Q. Subsequent to that time you told her you would have to foreclose if they didn't pay? A. Yes."

This evidence was sufficient to raise an issue as to the question of waiver or estoppel for determination by the court.

Finding no error, the judgment is affirmed.