Harold **TOPLETZ** et al., Appellants,

v.

Sylvester **THOMPSON**, Appellee.

No. 15686.

Court of Civil Appeals of Texas.

Dallas.

Dec. 9, 1960.

**152**

Saner, Jack, Sallinger & Nichols, H. Louis Nichols, Dallas, for appellants.

Hoyet A. Armstrong, Dallas, for appellee.

DIXON, Chief Justice.

Appellee Sylvester Thompson brought this suit against Jack Topletz, Harold Topletz, Velta M. Walker and Juanita Isaacs, pleading statutory trespass to try title involving a house and lot located at 4512 Congo Street in the City of Dallas, Texas; and pleading in the alternative to set aside a trustee's deed dated May 4, 1954. Thompson alleged that the trustee's deed should be set aside (1) because of a fraudulent scheme to divest him of title and possession, and (2) because notice of the trustee's sale had not been posted in three public places, as required by law.

Jack Topletz and Harold Topletz were holders of a note secured by a deed of trust lien against the property. It was through foreclosure of the lien that they now claim title to the property, as evidenced by the trustee's deed to them, of May 4, 1954.

Velta Walker is the son and Juanita Isaacs is the daughter of Alma Thompson, deceased wife of Sylvester Thompson. They are Sylvester Thompson's stepchildren.

A jury's answers to special issues were in substance as follows: (1) one of the notices of the foreclosure sale was not posted in a public place; and (2) prior to the conveyance of the property to Jack and Harold Topletz, Jack Topletz, for himself and Harold Topletz, agreed with Sylvester Thompson *or* Velta Walker that rents from the property would be applied to the debt owed by Sylvester Thompson, Velta Walker and Juanita Isaacs until advances of money made by Topletz were paid, when the property would be reconveyed to Thompson, Walker and Isaacs; (3) but at the time the agreement was made, Topletz did not intend to comply with it; (4) a bid of $300 by Jack and Harold Topletz at trustee's sale on May 4, 1954 was a grossly inadequate consideration; (5) believing themselves owners of the property, Jack and Harold Topletz made permanent improvements of a value of $1,300, but these improvements increased the value of the property only $800; (6) it was not a part of the agreement referred to in (2) above that Juanita Isaacs would live in the property and would pay on the debt to Topletz what she would otherwise have to pay as rent; (7) and the rental value of the premises from May 4, 1954, without improvements made by Topletz, was $50 per month.

Based on the above jury verdict judgment was entered (1) setting aside the trustee's sale of May 4, 1954 and the trustee's deed of the same date; (2) declaring said sale and deed void and of no effect; (3) awarding appellee Thompson a homestead right for life in the subject property against all defendants; and (4) granting appellee Thompson a money judgment against Jack and Harold Topletz in the amount of $1,014.

Jack and Harold Topletz have perfected their appeal by filing a supersedeas bond. Sylvester Thompson has perfected a cross-appeal by filing an appeal cost bond.

Appellants Topletz have briefed twenty-nine points on appeal. Appellee Thompson has briefed thirteen counterpoints and six cross-points. The nature of these points requires a somewhat detailed statement of the evidence.

### Evidence.

Alma Alexander acquired ownership of the house and lot May 1, 1944 for a consideration of $806.87, paying $484.69 cash, and executing a note for the balance in the amount of $322.18. This note had been paid in full by the time this controversy arose.

About a year later Alma Alexander married Sylvester Thompson and the couple occupied the house most of the time until death of Alma Alexander Thompson in 1952. Thompson testified that they made some improvements to the house soon after their marriage. A fire occurred in 1948 but the couple rebuilt the house with insurance money.

Alma Alexander Thompson died October 9, 1952. To pay funeral expenses Sylvester Thompson, Velta Walker, Juanita Isaacs and her husband executed a note for $541 payable in ninety days, secured by a deed of trust lien against the subject property. The note was payable to C. F. Sparks, one of the partners owning Peoples Funeral Service.

Life insurance proceeds were applied toward payment of this note and from time to time other payments were made, so that by April 6, 1954, according to C. F. Sparks, the balance due on the note had been reduced to $163.88. However there is in evidence a cancelled check of Hexter Title Company, endorsed on the back by Sparks, which check shows that Sparks was paid $308.88 by the Title Company in Topletz's behalf when the note and mortgage were transferred to Topletz. No payments had been made on the note for some time prior to the transfer to Topletz. Sparks testified that he had not posted notices for foreclosure, nor had he threatened to do so, but he had placed the note in the hands of an attorney for collection. Williams, the attorney, did not testify, so the record is silent as to what action he took to accomplish collection.

Velta Walker was permitted to testify, without objection, that he received a document (not admitted into evidence)[1] which he sent to his sister, Juanita Isaacs, because she too was one of the heirs to the property. Juanita then came to Dallas, and she and Velta went to see Sylvester Thompson, who was living on the property. None of them was able to pay the balance due on the note or make payments on it. Velta Walker and Juanita Isaacs then went to see Jack Topletz about refinancing the debt. They proposed that Juanita and her husband move into part of the property, Sylvester Thompson to remain in the other part, and that Juanita Isaacs and her husband would thereafter make payments to Jack Topletz in an amount equal to the rent they would

---

1. The record contains as an exhibit a notice of foreclosure sale dated March 10, 1954 advertising the sale to take place on the first Tuesday in April, 1954. The notice bears the name of George Allen, who was trustee for Sparks in the deed of trust. Sparks testified that the writing did not look like the signature of George Allen, the trustee, who was also Sparks' partner in Peoples Funeral Service. So appellee's objection was sustained, and the document was not admitted to evidence. Appellants then offered the document not as proving the truth of its contents, but for the limited purpose of showing that Velta Walker did receive through the mail at the time in question. Objection was again sustained, and the instrument was not admitted in evidence even for the limited purpose above stated. Nevertheless it appears as an exhibit in the statement of facts.

Later Velta Walker was permitted without objection to testify that after he received the document he sent it to his sister Juanita, who shortly thereafter came to Dallas to see what could be done about "disposing of the debt."

George Allen, the trustee, did not testify.

have to pay should the Isaacs live elsewhere. According to Velta Walker and Juanita Isaacs this plan was acceptable to Jack Topletz.

But it was at this point that trouble arose. All the parties involved, including appellee Sylvester Thompson, testified that Sylvester Thompson refused to agree for Juanita Isaacs and her husband to move into and occupy part of the premises. So the refinancing plan fell through.

Thereupon, according to Velta Walker and Juanita Isaacs, they told Jack Topletz, who had arranged to buy the Sparks note and mortgage, that Sylvester Thompson had refused to permit Juanita Isaacs to move into part of the house, that they could do nothing further toward paying the indebtedness, and that Jack Topletz would have to look out for himself.

The testimony of Juanita Isaacs is substantially in accord with that of Velta Walker. She testified that her brother forwarded to her a notice he had received of the foreclosure on the Congo Street property. It was then that she came to Dallas and she and Velta Walker attempted to make arrangements above described for the refinancing of the note through Jack Topletz.

Jack Topletz testified that he had known Velta Walker and Juanita Isaacs for a number of years. Velta Walker first called him by telephone about the Congo Street property. Velta wanted Topletz to refinance the Sparks note in order to prevent a foreclosure. Following this conversation Topletz went to see Sylvester Thompson who agreed to make payments on the note. Afterwards Velta Walker and Juanita Isaacs came to his office and it was agreed that Topletz would buy the Sparks note. Topletz then set in motion arrangements for the transfer of the Sparks note to himself and Harold Topletz. He understood that Juanita Isaacs and her husband were to move into part of the house and would apply on the note the money that they would otherwise pay as rent if they lived somewhere else.

Topletz also testified that when he found no agreement could be reached with Sylvester Thompson he caused the property to be posted for foreclosure and that at the sale he bought the property for $300; and that at the time the house was in such a delapidated state the property was not worth more than $300, and had no rental value whatever, having been condemned by the City authorities of the City of Dallas. He testified that he spent $3,195 in improvements in order to make the house habitable and suitable as rent property.

Topletz further testified that Sylvester Thompson refused to surrender possession of the property after the foreclosure, so he was twice put out of the property by the constable under a writ of restitution pursuant to judgment in a forcible entry and detainer suit. One of these occasions was on May 31, 1954 and the other was in September 1954. Both writs of restitution were introduced in evidence and are part of the record. But even thereafter, according to Topletz, Thompson continued his possession by running off carpenters hired by Topletz to make necessary repairs, and bothering tenants by moving back into the premises from time to time, thus causing some of the tenants to move out. Finally Topletz had to put Sylvester Thompson under a peace bond.

Sylvester Thompson testified that the only agreement he ever made with Topletz was entered into after Topletz had taken over the property, and that the agreement, an oral agreement, was that Topletz would convey the property to Thompson for $500. Thompson testified that another person was ready to put up the money for him but Topletz refused to carry out the agreement.

A. A. Slaughter, a real estate expert, testified that the reasonable value of the property on May 4, 1954, when Topletz bought it at the foreclosure sale, was $3,700; and that its rental value at that time was and still is $50 per month. Both at the trial and now on appeal the admissibility of Slaughter's testimony and its sufficiency to support

the jury's finding, have been challenged. Consequently, we shall be compelled later in this opinion to discuss Slaughter's testimony in greater detail.

The testimony concerning the alleged failure to post notices in three public places is also under attack and it will be necessary for us later to discuss it too.

It is evident from the record of their testimony that Velta Walker and Sylvester Thompson, especially Sylvester Thompson, are not well educated persons. This is said only in explanation of a fact obvious from the record: at times their answers indicate that they did not fully understand some of the questions asked and it was necessary for their attorneys to exercise patience in obtaining responsive answers, in clearing up inconsistent answers, or in obtaining answers which correctly stated what the witnesses apparently intended to say. Juanita Isaacs, while perhaps not especially well educated, for the most part gave clear and responsive answers.

Opinion.

Appellants' first and fifth points on appeal assert that since Thompson offered the trustee's deed in evidence without limitation, he is bound by the recitations in the deed that notices of the foreclosure sale were posted in three public places prior to the sale. Among the cases cited in support of this contention are Lock v. Morris, Tex. Civ.App., 287 S.W.2d 500 and Sellman v. American National Ins. Co., Tex.Civ.App., 281 S.W.2d 150.

The holding in those cases is not applicable here. Appellee is not bound by the recitations in the trustee's deed though he offered it in evidence without limitations, since his pleadings presented a challenge to the validity of the deed on the grounds of fraud. Dupree v. Quinn, Tex.Civ.App., 290 S.W.2d 329; Universal Credit Co. v. Boling, Tex.Civ.App., 108 S.W.2d 836; Colgrove v. Falfurrias State Bank, Tex. Civ.App., 192 S.W. 580; 20 Amer. Jur.

771. Appellants' first and fifth points are overruled.

Appellants in their second, third, fourth and thirteenth points, and in part in their sixth, seventh, ninth and twenty-sixth points contend that there was no evidence, or that there was insufficient evidence to support the jury's answers to special issue No. 1 to the effect that one of the notices of the foreclosure sale was not posted in a public place.

The principle testimony on the question was given by Jack Topletz. His father, S. Topletz, now deceased, had been appointed substitute trustee. Jack Topletz accompanied his father when the notices were posted. In fact Jack Topletz himself did the actual work of posting the notices with his father looking on from their parked automobile. One notice was posted at the courthouse, one near the intersection of Lamar and Hatcher Streets in South Dallas, and one near the intersection of Preston Road and Potomac Street in the Town of Highland Park.

Topletz's testimony was vague in some particulars. The South Dallas notice was posted on a telephone pole, or on a light pole, or it might have been a tree—he was pretty sure it was a tree.

At first he testified that the notice in Highland Park was posted at the corner of Mockingbird Lane and Preston Road. Later he remembered it was at the southwest corner of Potomac and Preston Road in a parkway between the sidewalk and the curb. He stated that there was a house at the corner where the notice was posted.

William Monroe Brock, Assistant Secretary-Treasurer of the Town of Highland Park, identified the zoning ordinance of the Town of Highland Park. The southwest corner at the intersection of Potomac Street and Preston Road is zoned for single family dwellings, though the property across the street is zoned for business. The ordinance especially provides that "no commercial, professional or *advertising sign*

of any character shall be permitted in a single Family Dwelling District." (Emphasis ours.) Brock also testified that a special place is provided at the fire station for posting notices. He had never seen a posting of sales notices at any other place than the fire station.

A. A. Slaughter, a real estate man, testified that the southwest corner at the intersection of Potomac Street and Preston Road is a vacant lot.

■ The terms "public place" as used in Art. 3810, Vernon's Ann.Civ.St. is relative, and whether a notice was posted in a public place within the meaning of the statute is sometimes a question partly of fact and partly of law. Thomas v. Martin, Tex. Civ.App., 166 S.W.2d 934; Hunt v. Isom, Tex.Civ.App., 77 S.W.2d 1095. It is such a question here.

■ It is to be remembered that appellee Sylvester Thompson was plaintiff in the trial court. He alleged as part of the grounds of his recovery, and the burden was therefore on him to prove by a preponderance of the evidence, that the statutory notices of foreclosure were not posted in the manner required by law. The question is: was there sufficient evidence to support the jury verdict that one of the notices was not posted in a public place.

■ While we are not entirely free of doubt in the matter, we are of the opinion that there was sufficient evidence to support the jury's verdict, at least as to the notice posted in the Town of Highland Park. Appellants' second, fourth, and thirteenth points, and in part their sixth, seventh, ninth, and twenty-sixth points are overruled.

In their sixteenth point on appeal and in part in their sixth and seventh points appellants assert that there was no evidence, or that there was insufficient evidence to support the jury's answer to special issue No. 2, to the effect that Jack Topletz agreed with "either—Sylvester Thompson, or Velta M. Walker" that the rent would be applied to the debt of Sylvester Thompson, Velta Walker and Juanita Isaacs, and that when the appellants Topletz had received the amount of their money advancements they would reconvey the property to the said parties; and to special issue No. 9 to the effect that it was not part of such agreement that Juanita Isaacs would live in the property in question and pay on the note what she otherwise would have to spend for rent.

More than a year prior to the trial the depositions of Velta Walker and Jack Topletz were taken by the attorney for Sylvester Thompson. Neither Velta Walker nor Jack Topletz in their depositions mentioned that part of the proposed agreement was for Juanita Isaacs to move into the house and apply as payments on the note the money she would otherwise have to pay as rent. In his testimony at the trial Velta Walker was very positive that such occupancy and application of rent by Juanita Isaacs were part of the agreement. Topletz also testified that he understood the occupancy by Juanita was part of the arrangement.

The attorney for Sylvester Thompson cross-examined both Jack Topletz and Velta Walker about their failure to mention this part of the agreement when their depositions were taken. They were also questioned about it by their own attorney on redirect examination. We quote this part of Velta Walker's testimony:

"Recross Examination.

"By Mr. Armstrong: Q. When I took your depositions, Velta, why didn't you tell me that a part of the agreement was that Juanita was to move into the house? A. Mr. Armstrong, if you remember you helped me to limit—answer your questions direct, the same as you were when you came out to my house and I were talking to you, saying things that I told you then, howsoever I stood to lose the whose thing; * * *

"Q. Now that you have made your little speech, you did not say anywhere in your deposition that Juanita was a part of your agreement that you had with Mr. Topletz, did you? A. Did you ask me?

"Q. I say,—

"The Court: Don't argue with the answer.

"Redirect Examination.

"By Mr. Nichols: Q. Were you asked by Mr. Armstrong that question when he took your deposition? A. No, sir.

"Q. Did Mr. Armstrong tell you to confine your answers to the questions which he asked? A. Correct.

"Q. As a matter of fact, he jumped on you a time or two because you tried to deviate? A. That's right."

Jack Topletz stated that he had not so testified in his deposition because the question had not been asked.

The testimony of Jack Topletz, Velta Walker and Juanita Isaacs about the occupancy of part of the house by Juanita seems to have some corroboration from Sylvester Thompson himself. He testified that he refused to agree for Juanita Isaacs to move into the house, but that nevertheless following their first discussion about the past due payments on the note, Juanita came out to the house with a load of furniture and he would not let her bring it into the house. Juanita Isaacs denied that she ever came to the house with a load of furniture, but insisted that though it was part of the proposed agreement with Topletz, Sylvester Thompson would not agree to it and would not let her move into the house.

The alleged agreement was entered into before Topletz had foreclosed on the property, indeed, before he had acquired the note and mortgage from Sparks. That being true it is difficult to understand why the alleged agreement should have included a promise by Topletz to reconvey the property to Velta Walker, Juanita Isaacs and Sylvester Thompson upon their completing the payment on the note. By way of explanation the attorney for Sylvester Thompson says that the parties doubtless had in mind the equitable title which went with the note and mortgage, and that by reconvey they meant that Topletz was to execute a release upon full payment of the note. The evidence fails to convince us that Velta, Juanita or Sylvester knew enough about equitable titles to real estate to have in mind the reconveyance of the equitable title.

The most positive bit of testimony offered by Sylvester Thompson was that he did not enter into any agreement at all with Topletz until after the foreclosure, when Topletz agreed to convey the property to him for $500, but failed to do so. Topletz emphatically denied entering into any such agreement.

In the interest of time and space we shall not further discuss the evidence in this connection. We do not agree with appellants that there is no evidence to support the jury's answers to special issue Nos. 2 and 9. But we do agree that the evidence is insufficient to support the jury's answers. Therefore we sustain appellants' second, third, fourth and thirteenth points and in part their sixth, seventh, ninth, seventeenth, eighteenth and twenty-sixth points insofar as said points raise the question of the insufficiency of the evidence, and we sustain also in part points Nos. sixteen, seventeen, eighteen and twenty-two, since the answers to these points cannot stand in view of our sustaining the other points above.

In their twelfth point appellants say that the court erred in allowing A. A. Slaughter to testify regarding the value of the property on May 4, 1954, because Slaughter had not qualified as an expert witness, and further, his testimony was based on assumed facts contrary to the undisputed evidence.

■ We overrule appellants' twelfth point insofar as it attacks Slaughter's qualifications as an expert. The record shows that for seventeen years Slaughter has been a real estate agent and broker in Dallas, dealing in commercial, industrial and residential properties. At the time of the trial he was a member of Dallas Real Estate Board, the State Real Estate Board, the National Real Estate Board and the National Institute of Real Estate Brokers. He had done a great deal of real estate appraisal work, in fact had recently made a specialty of appraisals. We think that in the light of this testimony and other testimony which we shall not detail, the trial court properly overruled appellants' objection that Slaughter was not qualified to give testimony as an expert on real estate values.

But we must agree with appellants that Slaughter's opinions as to value of the property on May 4, 1954 and as to the rental value of the property since May 1954 are based on obviously erroneous assumptions of fact, as we shall point out in our discussion of the next points on appeal.

In their fifteenth, nineteenth, twenty-first, twenty-third, twenty-fifth and in part in their ninth, tenth and twentieth points appellants alleged in substance that there is no evidence, or that there is insufficient evidence to sustain the jury's answer to special issue No. 4(a) that the amount bid by Jack and Harold Topletz at the trustee's sale on May 4, 1954 was a grossly inadequate consideration for the property, to special issue No. 11 that the reasonable rental value per month of the premises in question from May 4, 1954 without the improvements made by defendant Topletz was $50, and to special issue No. 8 that the improvements made by Topletz increased the value of the property only $800.

The only evidence in support of the above findings was that of A. A. Slaughter. He testified that the market value of the property on May 4, 1954 was $3,700, and its reasonable rental value since May 4, 1954 was $15 per week.

Slaughter testified that he had not seen the property in question until about two months before the trial in April 1959. He saw no evidence of any improvements since 1954, though he learned from deed of trust records of a note and mortgage for $541 executed in 1952 by Velta Walker, Juanita Isaacs and Sylvester Thompson, which note and mortgage he supposed were for repairs and improvements to the property. In this assumption Slaughter was plainly wrong. The $541 note and mortgage referred to by him were not given to pay expenses of improvements to the property. They were the very instruments involved in this lawsuit and were given to defray the funeral expenses of Alma Alexander Thompson, the wife of Sylvester Thompson and the mother of Velta Walker and Juanita Isaacs.

We are reluctant to prolong this opinion by quoting more testimony, but we believe it is appropriate to quote Slaughter's testimony on the effect of improvements on the value of real estate:

"Q. Well, you will concede, will you not, that the condition of the property in 1954 would have something to do with its value? A. I doubt it, sir; I believe it was worth what it is worth today, it would have been worth that much in 1954.

"Q. Regardless of the condition of the improvements? A. Yes, sir; there isn't much leeway there.

"Q. Well, do the condition of the improvements have anything to do with the reasonable rental you can get from the house? A. Yes, sir, I think so; if that improvement was the use of the back porch, closing it in and making the kitchen and bath out of it, it would effect the rental value.

"Q. You don't know when that improvement was put on there, do

you? A. Other than this information that I gave you.

"Q. How much would that effect the rental value of the property? A. Well, I couldn't say, sir, exactly, but you know a house without a bath or a kitchen wouldn't have too much rental value.

"Q. Well, how much would it have; you are an expert—how much would it have? A. I just don't know, sir.

"Q. You mean you don't know—you don't have an opinion as to the reasonable rent— A. Well, it depends on how much the demands were, and I would still say, under—if the demand was big enough it would still rent for about the same price.

"Q. You were living in Dallas in 1954, weren't you? A. Yes, sir.

"Q. You knew what the demand was, did you? A. Yes, sir, it has been—

"Q. —Well, based on your demand, what is your opinion of the reasonable rental value of this property in 1954 without the kitchen and bathroom on it? A. Well, sir, the rental value that I gave there, and the fact there is no vacancies in the area, I would say it might rent for the same amount of money.

"Q. You don't know whether there were any vacancies there in '54 or not, do you? A. No, sir.

"Q. There might have been vacancies up and down the street in 1954, might there not have? A. I wouldn't know.

Q. All right. Would that have anything to do with the rental value of the property? A. It depends on the landlords—I imagine it would.

"Q. Now, it is your testimony that regardless of whether there was a kitchen there or not, or regardless of

the condition of the improvements in '54, that would not effect either the fair value of the property or the rental value of the property? A. It wouldn't effect it much.

"Q. Fifty cents, a nickel, a quarter or how much? A. I just don't know."

Jack Topletz testified, and his testimony is not contradicted, that when he took over the house in 1954 the garage and front and back porches, made of lumber, were leaning and about to fall in. The house had a bathroom which contained a commode, but was too small to have a tub. There was no kitchen sink and no hot water. The house had been condemned by the City of Dallas, and Topletz received letters from the City demanding that he make repairs.

Topletz testified that after he gained possession of the premises for the second time under the writ of restitution of September 1954, he made necessary repairs.

All parties to this lawsuit testified that after he took over, Topletz made extensive improvements to the property. He extended and enclosed the back porch, and laid a concrete floor to it. He also built a concrete front porch. He enlarged the bathroom and put in a bath tub and lavatory and new plumbing. He put a sink and kitchen cabinets in the kitchen, put wall paper on the walls of the rooms and painted the house. He put in windows and a new roof. He testified that these improvements were made at cost of $3,195, that the value of the property before the improvements was only $300, that it had no rental value before the improvements were made, and that it had rental value after the improvements were made of $15 per week.

■ A witness in order to give testimony as to the value of a thing must have a knowledge of the particular thing to be valued. This knowledge may become available to him (1) from personal knowledge and inspection, or (2) from a proper hypothetical question, or (3) from both per-

sonal knowledge and a proper hypothetical question. San Antonio & A. P. Ry. Co. v. Barnett, 27 Tex.Civ.App. 498, 66 S.W. 474, 477; Anderson v. Reichart, Tex.Civ. App., 116 S.W.2d 772, 774.

In Wigmore on Evidence, Third Edition, Volume III, § 720, p. 55, the author says:

"As with other kinds of knowledge * * * so with knowldege of values, the place of this element may be supplied by a hypothetical question. Thus where a witness is competent to speak of house-values but has not seen the house in question, the specifications and other particulars may be placed before him hypothetically for an opinion, and then his knowledge of the value-standard may become available; or, in some cases, his attention may be called to a thing assumed to be substantially similar to that in question, and his judgment may be given on the hypothesis of this similarity. This hypothetical basis is legitimately and frequently employed as a substitute for actual observation."

■ In the case now before us, A. A. Slaughter did not see or inspect the property in question until about two months before the trial in 1959. He did not see the property on May 4, 1954. Nevertheless, he would properly have been permitted to testify as to its value on May 4, 1954 *provided a proper hypothetical question had been propounded to him describing the condition of the house on May 4, 1954.* This was not done. His voluntary assumptions of fact were plainly erroneous. Appellants vigorously objected to Slaughter's evidence as to values of the property on May 4, 1954 on several grounds, one of them being that no proper hypothetical basis had been laid for his opinion.

■ In the light of the record before us we must hold that the overwhelming weight and preponderance of the evidence was so contrary to the jury's answers to special issues Nos. 4(a), 8 and 11 as to amount to an injustice. Therefore, we sustain appellants' fifteenth, nineteenth, twenty-first, twenty-third and twenty-fifth points on appeal and in part their ninth, tenth, and twentieth points insofar as said points attack the sufficiency of the evidence to support the answers of the jury above mentioned.

In their eleventh point appellants charge that it was error for the trial court to permit appellee to offer in evidence the zoning ordinance of the Town of Highland Park since said ordinance was not intended to prevent the posting of notices in public places and would be unconstitutional if so construed because the ordinance would then be in conflict with the statute providing for the posting of notices in public places.

The ordinance expressly provides that "no commercial, professional, or advertising sign, of any character, shall be permitted in the single family dwelling district."

Appellants cite us to no authority in support of their contention. Appellee in answer to appellants' contention cites us to McGuire v. Purcell, 7 Ill.App.2d 407, 129 N.E.2d 598; Village of Riverside v. Kuhne, 335 Ill.App. 547, 82 N.E.2d 500; International Company v. City of Miami Beach, Fla., 90 So.2d 906; Grant v. Mayor & City Council of Baltimore, 212 Md. 301, 129 A.2d 363; and Silver v. Zoning Board of Adjustment, 381 Pa. 41, 112 A.2d 84. These cases while not exactly in point, do uphold the right of a city to regulate and prohibit the use of signs in residential and other zoning districts as a proper exercise of a city's police power.

■ We have not been cited to any Texas cases exactly in point. But the constitutionality of zoning ordinances in general has been too firmly established in this State to require a citation of authorities. A zoning ordinance will be presumed to be valid. An extraordinary burden rests

**161**

on one attacking a zoning ordinance to show that it is invalid. City of Waxahachie v. Watkins, 154 Tex. 206, 275 S.W. 2d 477.

 We see no conflict between Art. 3810 V.A.C.S. providing for posting of notices in three public places within a county, and the zoning ordinance of the Town of Highland Park forbidding advertising signs in districts zoned for single family dwellings. Surely the Legislature did not mean to say that a person has a right to post notices in any and every public place in a county regardless of the rights conferred on cities, towns and other political subdivisions to pass reasonable zoning regulations and restrictions in the exercise of their police power. Appellants' eleventh point is overruled.

We have considered appellants' other points. They are overruled.

In six cross-points on appeal Sylvester Thompson, as cross-appellant, alleges (1) the court erred in offsetting Thompson's recovery by $800, representing the increased value from improvements since the jury findings negative good faith on the part of cross-appellees, and (2) since the jury's finding that cross-appellees believed themselves owners of the property when they made the improvements, was not an ultimate issue; (3) Sylvester Thompson should have been awarded full title because cross-appellees were trespassers; (4) the court should have cancelled the trustee's sale proceedings and removed cloud from title, thereby leaving the parties where they were before the sale; (5) it was error to award cross-appellant Thompson only a homestead right for life, because the fee simple estate in cross-appellees defeats Thompson's right to assert a claim for improvements made during occupancy; and (6) the court erred in offsetting Thompson's recovery of rent by $308.88 the amount paid by Topletz for the Sparks note.

Since we have decided that the main appeal must be sustained and the cause reversed and remanded for another trial, Thompson's cross-points on appeal cannot be considered well taken. They are overruled.

The judgment of the trial court is reversed and the cause remanded for another trial.