**CITY OF AUSTIN and State of Texas,
Appellants,**

v.

**CAPITOL LIVESTOCK AUCTION CO., Inc.,
Appellee.**

No. 11576.

Court of Civil Appeals of Texas.

Austin.

Nov. 6, 1968.

Rehearing Denied Dec. 4, 1968.

Doren Eskew, City Atty., Austin, Crawford C. Martin, Atty. Gen., George M. Cowden, First Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., Watson C. Arnold, Dudley Fowler, J. Bruce Willis and Woodrow Curtis, Asst. Attys. Gen., Austin, for appellants.

Garey, Colbert & Kidd, Jack Garey, Austin, for appellee.

O'QUINN, Justice.

This is an eminent domain case in which the City of Austin condemned about eight-tenths of an acre of land for use in widening State Highway 183 between the Colorado River and the Bergstrom Interchange within the city limits.

The State of Texas intervened as party plaintiff shortly before the case went to trial because of its obligation to pay fifty percent of the costs of construction and acquisition of property.

The trial court entered judgment based on jury findings in the amount of $141,555 for Capitol Livestock Auction Company, Inc., in compensation for the taking of .8107 of one acre of land and for damages to the land remaining consisting of about 6.67 acres. The judgment made allowance for deposit of $38,500 withdrawn by the condemnee and included accrued interest from the date of taking.

The City of Austin and the State have appealed and assign 23 points of error. Appellee assigns 12 counter points of error.

The contentions of appellants under the assigned errors are stated briefly under six general headings:

(1) Appellee was not entitled to severance damages because it was not the owner of the remainder on December 12, 1962, the date of the taking of the 9/10th of an acre.

(2) It was error to exclude the opinion testimony of an expert witness (Culp) for appellants as to value of the remainder before and after the taking.

(3) Numerous errors in evidentiary matters relating to the tract as a whole and to the remainder resulted in an excessive and improper verdict and a judgment requiring reversal and remand of the cause.

(4) There was no evidence and insufficient evidence to support the jury's finding that $41,678 was the value of the land taken.

(5) It was error to allow an expert witness (Legge) for appellants to be examined by deposition as to testimony the witness gave before the commissioners.

(6) It was error to overrule motion of appellants to suppress evidence of the price a corporation having power of eminent domain paid for land across the highway from the land taken in this cause.

Hearing before the commissioners was October 23, 1962. The award of the commissioners was made October 29 and filed the next day. About two days later, on November 1, Capitol Livestock Auction Company, appellee, made a contract with another corporation to convey all of its

land, except the part being taken for widening the highway. Possession of the 6.67 acres being sold was delivered pursuant to the contract of sale to the purchaser November 5. The parties held a closing of the sale December 11, and appellee executed a deed to the property the same day.

The following day, December 12, the City of Austin deposited the amount of the award made by the commissioners after the hearing of October 27.

When the case went to trial May 8, 1967, the parties were in agreement, and the trial court proceeded on the basis, that December 12, 1962, was the date of taking.

The condemning authorities took the position in the trial in 1967 and contend on appeal that Capitol Livestock Auction did not own the 6.67 acres on December 12, 1962, and therefore was not entitled to severance damages.

The trial court ruled as a matter of law that Capitol Livestock Auction on December 12 was owner of the 6.67 acres, which it had contracted to convey, and that the case would be heard as a partial taking.

Capitol Livestock Auction took the position at the trial and contends on appeal that because the deed executed December 11 was not delivered to the purchaser until a week later, title to the 6.67 acres was not conveyed until after December 12, the date of the taking.

The deed on its face shows that it was received by the county clerk for recording December 19 and was recorded December 21. The president of Capitol Livestock Auction testified that delivery of the deed was intentionally delayed until personal checks on out of town banks had cleared following the closing held December 11.

Appellants argue that equitable title to the 6.67 acres passed to the purchaser with the making of the contract of sale on November 1 because the terms of the contract eventually were carried out by the

parties and the purchaser went into possession by November 5.

Under terms of the contract, the purchaser operated an auction business on the premises beginning with the taking of possession, but proceeds were held in escrow pending the making and execution of the deed and payment of the consideration. The sum of $25,000, placed in escrow under the contract, was released as of December 11. At the same time the purchaser paid a cash consideration of $50,000, by check, and executed and delivered a note in the sum of $75,000, which was the balance of the total purchase price of $150,000.

It appears undisputed that Capitol Livestock Auction and the purchaser of the 6.67 acres made the contract of sale on November 1 on the basis that the taking was an accomplished fact. The award of the commissioners, as placed of record October 30, assessed "the actual damages to * * * Capitol Livestock Auction Co., Inc., as owner and claimant of the tract of land * * * by reason of said condemnation as being the value of the fee title to said land, and improvements, *including severance damages* * * *" (Emphasis added). Capitol Livestock filed its objections to the amount of the award and alleged that the award "did not provide for adequate compensation *for the severance damages to the balance of the property remaining.*" (Emphasis added). The objections were filed November 6 and were served on the City of Austin on December 10, 1962.

The condemning authorities did not file objections or exceptions to the allegations of Capitol Livestock with reference to severance damages after objections to the award were filed November 6, 1962. Trial of the case began May 8, 1967, about four and one-half years later.

In the course of the trial in 1967, after Capitol Livestock had rested its case, the condemning authorities, on May 12, sought to file a trial amendment, which the court

refused. The trial amendment set up the contention made on appeal that title to the remainder of the tract of land had passed prior to the date of taking, December 12, and Capitol Livestock was not entitled to severance damages. The proffered trial amendment challenged jurisdiction of the county court to adjudicate the title question concerning the 6.67 acres remaining after the taking of .8107 of an acre for highway purposes.

The same contentions had been made by the condemning authorities in a motion to suppress evidence of severance damages filed shortly before trial. The motion was overruled by the trial court before the trial started on May 8.

The condemning authorities took possession of the land condemned for highway purposes in January, 1963, about one month following deposit of the amount of the award made by the commissioners. Actual construction of the highway widening on the Capitol Livestock tract began January 24, 1963. The project had been completed and the widened highway was in use by the public when the case was tried in May, 1967.

■ Whether Capitol Livestock had title to the 6.67 acres remaining after severance of .8107 of an acre for the highway is a question the trial court did not have jurisdiction to decide. Thompson v. Janes, 151 Tex. 495, 251 S.W.2d 953.

In the original petition filed by the City of Austin the allegation was made that Capitol Livestock was "the owner and claimant of the fee simple title" to .8107 of one acre of land described by metes and bounds. The City further described the .8107 of an acre as " * * * being *out of and a part of that certain tract of land* * * * conveyed to the Capitol Livestock Auction Co., Inc. by warranty deed dated September 1, 1956 of record * * * in the deed records of Travis County * * *" (Emphasis added). It was clear from the pleadings that the land being taken was

part of a larger tract acquired by the condemnee in 1956.

■ The allegations in condemnor's petition conferred jurisdiction upon the county court to hear the condemnation proceedings, and after the right to condemn the property had been established, the only issue before the trial court was the amount of damages suffered by Capitol Livestock as a result of the taking. Gandy v. State, 319 S.W.2d 375 (Tex.Civ.App., Beaumont, no writ).

The commissioners found that Capitol Livestock had suffered severance damages, as well as damages for the land taken. Capitol Livestock filed objections complaining of inadequate award for severance damages, as already observed, on November 6, and caused the City of Austin to be served December 10, 1962, two days before the agreed date of taking, December 12.

■ It is settled that the City of Austin had a right to abandon the project before judgment was entered, or to correct the description of the land before announcing for trial, provided neither such move should be attempted by the condemnor after taking possession of the property and constructing the highway on it. Leonard v. Small, 28 S.W.2d 826 (Tex.Civ.App., Fort Worth, writ ref.); Brazos River Conservation and Reclamation Dist. v. Allen, 141 Tex. 208, 171 S.W.2d 842; Casey v. State, 331 S.W.2d 950 (Tex.Civ.App., Amarillo, no writ). The Supreme Court in Brazos River Conservation and Reclamation Dist. v. Allen limited the right of the condemnor to correct errors, dismiss proceedings, or to abandon the purpose of taking land by the Court's holding that the condemnor "may not exercise any of these rights *to the prejudice of the land owner*." 171 S.W.2d 842, 844, col. 2. (Emphasis added.)

■ After the condemning authorities gained possession of the land under the condemnation proceedings, and were no longer able to restore possession to Capitol Livestock and thereby re-establish the

*status quo*, it would be improper and prejudicial to permit the condemnors to amend their pleadings to challenge the title of the condemnee. Lower Nueces River Water Supply District v. Cartwright, 160 Tex. 239, 328 S.W.2d 752 (1959).

In the Cartwright case the Supreme Court stated that an application to condemn "stands as an admission of title only so long as it is not withdrawn, or some action is taken in reference thereto which renders a withdrawal *prejudicial to the opposing party.*" The court concluded that " * * * if the right of dismissal may be exercised *without prejudice to the condemnee,* then such right exists and when exercised, operates to remove all admissions as to title which are inferred from and incident to the filing of an application for the appointment of special commissioners * * *." (Emphasis added).

█ This rule, when applied to the facts of this case, brings us to the decision that the condemnors did not have the right to change their application or demand after that stage of the proceedings was reached at which correction, change, partial withdrawal, or amendment would prejudice Capitol Livestock.

Throughout the initial proceedings both the City and Capitol Livestock considered the condemnation as a partial taking in which it would be proper to consider severance damages. The commissioners evidently heard testimony on severance damages, which were specifically included in the award. Objections filed by Capitol Livestock were direected expressly to the inadequacy of severance damages as in a partial taking, as well as to inadequacy of the award for the land taken. The City did not challenge the right of Capitol Livestock to severance damages for injury to the 6.67 acres until joined belatedly by the State four days before the case went to trial in 1967. Meanwhile, as we have noted, the State in January, 1963, had taken possession of the land condemned, more than four years before the trial, and had completed its project by which Highway 183 was widened to occupy the land.

The City and the State certainly were in no position at the time of trial to return possession of the land to Capitol Livestock or to re-establish the *status quo.* Capitol Livestock as the condemnee in a proceeding under which the condemnors had gained possession was entitled to the fundamental right to possession or payment. Fort Worth Concrete Company v. State, 400 S. W.2d 314 (Tex.1966). The move by the condemnors to amend or to change their demand, if allowed under the facts and circumstances of this case, would place Capitol Livestock in the position of having lost possession of its property without the security of payment for damages. The award that had been deposited and withdrawn was attacked by the condemning authorities through their move for trial amendment as payment for something Capitol Livestock did not own.

In Thompson v. Janes, supra, the condemnor sought to dismiss part of the land from the suit on the ground that condemnor had ascertained that the condemnees did not own that part of the land. The Supreme Court held that the move to dismiss was properly refused by the trial court. The Court said that to allow the trial amendment and dismissal would result in the condemnees having neither possession of the land nor compensation therefor. See Fort Worth Concrete Company v. State, supra, 400 S.W.2d 314, 317, col. 1. Logically we believe this principle of law likewise applies to this case, even though here condemnors question condemnee's title to the remainder and not to any part of the portion actually taken.

The condemning authorities in this case sought in effect to dismiss the action instituted in 1962 and to relitigate in 1967 the matter of damages. We think this would result in obvious prejudice to Capitol Livestock. Lower Nueces River Water Dist. v. Cartwright, supra; Brazos River Conservation and Reclamation District v.

Allen, supra. Having drawn down the award money, which included compensation for severance damages, Capitol Livestock had consented to the taking and could not in the trial challenge the right of the condemnors to take its property under the power of eminent domain. State v. Jackson, 388 S.W.2d 924 (Tex.1965); Southwestern Bell Telephone Company v. Brassell, 427 S.W.2d 709 (Tex.Civ.App., Tyler, no writ). Since the only issue before the trial court was the amount of damages Capitol Livestock had suffered because of the taking, to allow the condemnors to litigate additionally the question of title would be so unfair to the condemnee as to constitute prejudicial harm.

The points of error directed to the action of the trial court in refusing to allow condemnors by trial amendment to raise the issue of title are overruled.

The condemning authorities assign as error the action of the trial court in excluding the testimony of James Culp, an expert witness, as to value of the 6.67 acres immediately before and after the taking in December, 1962.

Culp qualified as an expert with comprehensive and varied experience throughout Texas in property appraisals extending over a period of nineteen years. He had originally entered the real estate business 28 years prior to the date of his testimony. Culp testified he was acquainted with the Capitol Livestock property in 1962 by reason of passing the premises along the highway, but he did not actually undertake to appraise the property until January, 1967. Culp stated that from the investigation he made he had an opinion as to the fair market value of the land and improvements as of December 12, 1962.

Upon objection by counsel for Capitol Livestock, the trial court refused to permit Culp to state the fair market value in his opinion the land and improvements had in December, 1962. The objection made in the trial and urged on appeal is that, although an expert, Culp was not qualified to assign a value to the improvements because of material changes in the improvements between 1962 and 1967.

In making this contention, Capitol Livestock relies upon the rule that where the expert witness acquired his knowledge at a date later than the date of taking, admissibility of his opinion depends upon whether there has been any substantial change in the condition of the property. Culp's qualification as an expert appears not to have been questioned by Capitol Livestock, and counsel for the condemnee repeatedly stated in the trial that no objection was being made to testimony from Culp as to value of the land in December, 1962. Objection was leveled at testimony as to the value of both land and improvements because of claimed substantial and material changes in the improvements.

The rule upon which Capitol Livestock relies is expressed in Nichols on Eminent Domain, section 18.43(b). In the absence of evidence that the property is substantially in the same condition, it has been stated that a long interval of time between the date of inspection and the date for determining value "may be fatal on appeal or exception." 159 A.L.R. 7, 93. Capitol Livestock also cites Topletz v. Thompson, 342 S.W.2d 151 (Tex.Civ.App., Dallas, no writ) in which the expert witness testified to market value of a house as of May, 1954, which he had not seen until shortly before trial in April, 1959. There was testimony of "extensive improvements to the property" in the interim of five years. The witness testified that the improvements mentioned would not change his opinion as to market value. The appellate court held that the trial court erred in permitting the witness to testify because "His voluntary assumptions of fact were plainly erroneous." 342 S.W.2d 151, 160, col. 1.

■ The court in Topletz v. Thompson, supra, stated the general rule that a witness testifying to the value of property must have knowledge of the particular property, and that this knowledge may be avail-

able to the witness from personal knowledge and inspection, from a proper hypothetical question, or from both personal knowledge and proper hypothetical questions. 342 S.W.2d 151, 160, col. 1, citing San Antonio and A. P. Ry. Co. v. Barnett, 27 Tex.Civ.App. 498, 66 S.W. 474 and Anderson v. Reichart, Tex.Civ.App., 116 S.W.2d 772. The court observed that the expert witness in the Topletz case "would properly have been permitted to testify as to its value" as of the earlier date if "a proper hypothetical question had been propounded to him describing the condition of the house on May 4, 1954." Vigorous objection had been made to the testimony of the witness on several grounds, the court pointed out, "one of them being that no proper hypothetical basis had been laid for his opinion."

In Hubbard v. Harris County Flood Control District, 286 S.W.2d 285 (Tex.Civ.App., Galveston, writ ref. n. r. e.) an expert witness testified that he had not seen the property before February, 1955, but could reliably value the property as of June, 1954, in accordance with the usage of his profession as an appraiser, "assuming no material change in condition, which was established." 286 S.W.2d 285, 288, col. 1.

It was contended by the condemning authorities that although admittedly there had been changes in the improvements on the Capitol Livestock premises, the changes had been neither substantial nor material. The parties in general were in agreement regarding structural alterations of the sheds, pens, alleys, loading chutes, and the cafe, for example, as well as in the fact that there had been some deterioration in appearance from lack of new paint. In the view of an executive officer of Capitol Livestock, alterations subsequently made were "sloppy" and "shoddy."

There was testimony undisputed in the record that repair and maintenance of stock pens in such an installation as Capitol Livestock operated is continual. Culp testified that "generally the operator rebuilds his pens every two or three years, and if it's after a big sale sometimes they will have to call somebody in after a big sale and work on some of them. It is a continuous operation. It is not a thing that you go for fifteen years, and, then, remodel or something."

In making proof under their bill of exception, the condemning authorities introduced the testimony of an expert witness who had appraised the property in December, 1962, the time of taking, and again in January, 1967, the month Culp had made his investigation. The witness, Harold Legge, a qualified appraiser, testified that in his opinion the changes made in the interim between 1962 and 1967 did not exceed a value of $5,000, or not in excess of about three to three and one-half percent of the total value of the improvements. From the viewpoint of an appraiser, Legge testified, a variation of fifteen to twenty percent is permissible in arriving at market value, and the changes made in the improvements of Capitol Livestock were minor and did not materially affect the value. Legge's enumeration of the several changes made substantially coincided with other testimony as to the nature of structural alterations.

We conclude that the testimony of James Culp as a qualified experienced appraiser was admissible as a statement of his opinion of market value for the land and improvements at the time of taking in December, 1962. Culp testified that he had reviewed records of sales of other property in the neighborhood, that he had interviewed officers of Capitol Livestock who were familiar with the property in 1962, and had made other investigations usually and customarily made in producing an appraisal. Culp related his visit to fourteen other auction installations in Texas and the studies he made of their improvements and operations. The witness reviewed his training, experience, observation, and general familiarity with the area and his consideration of various sales in the region.

When proof was made under the bill of exception, Culp testified that by using his experience as an appraiser, by investigation of the property and inspection of it in January, 1967, he was able to arrive reliably at values before and after the taking of land and improvements through use of his regular appraisal techniques. It was his opinion that the 6.67 acres remaining had a value of $126,000 before the taking and $116,500 after the taking, and that the .8107 of an acre taken had a fair market value of $10,000.

■ We are aware of the usual discretion left with the trial court in passing on the admissibility of testimony as to market value in cases of this nature. We are unwilling to hold that the trial court clearly abused his discretion in excluding Culp's testimony based solely on his investigations in January, 1967.

The condemning authorities, upon being denied proof of market value by Culp, based on his investigations alone, next sought to produce the same testimony by means of hypothetical question. The trial court likewise excluded this testimony. If this action was erroneous, the error requires reversal of the case, provided we conclude that "in all reasonable probability the jury returned a verdict other than that which it would have returned had it received the benefit of the evidence which was excluded." Maddox v. Gulf, Colorado & Santa Fe Ry. Co., 293 S.W.2d 499 (Tex. Civ.App., Fort Worth, writ ref. n. r. e.).

We have examined the entire record and conclude that condemnors did not comply with the prerequisites of a properly framed hypothetical question. Shuffield v. Taylor, 125 Tex. 601, 83 S.W.2d 955, 960, col. 2. The hypothetical question incorporated fourteen exhibits introduced in evidence, consisting of plats, maps, and photographs of grounds, buildings, and other improvements. We find that the question failed to supply all the missing facts upon which the witness could form an opinion.

After asking Culp to examine the exhibits placed in evidence by condemnors and condemnee, counsel for condemnees asked the following hypothetical question:

"Q Now, Mr. Culp, I want you to assume that the property as shown in Defendants' exhibits 1, 5, 6, 4 and 8 together with the property as shown by Plaintiff's exhibits 1, 2, 3 and 4 is the condition in which the Capitol Livestock Auction Company's land and improvements existed as of December 12, 1962. I will ask you to make that assumption. Now, Mr. Culp, having made that assumption, do you have an opinion as to the fair market value of the Capitol Livestock Auction Company tract together with the land and improvements as of December 12, 1962."

Four of the exhibits were aerial photographs showing the improvements as seen from the air. Five exhibits were schematic hand drawn diagrams, not drawn to scale, of some of the structures. The record shows that the major changes in these improvements had taken place in the nearly 74,000 square feet of livestock pens under a metal shed, and that it was in this area that the deterioration and damage, "shoddy" repair work, and lack of repairs were most apparent. The hypothetical question did not include any facts pertaining to these changes. No plat, photograph, or other proof reflected the nature or extent of these changes.

■ Condemnors had the burden to supply the missing facts upon which the witness could base his opinion. Shuffield v. Taylor, supra; Fidelity Union Casualty Co. v. Dapperman, 47 S.W.2d 408 (Tex. Civ.App., Amarillo, writ dism.). The facts set out in the hypothetical question must have been admitted into evidence. Sabelli v. Security Insurance Company of New Haven, 372 S.W.2d 348 (Tex.Civ.App., Austin, writ ref. n. r. e.).

■ Culp admitted that much of the information he had concerning the changes

was based principally on what he had learned in talking to other persons. The trial court properly excluded this testimony. Fidelity Union Casualty Co. v. Dapperman, supra. The details of the type and extent of the changes not being in evidence, condemnors failed to carry the burden of proving facts needed to support the hypothetical question.

■ The question as framed failed to meet the requirement that it be so clear and specific as not to be confusing, and that it be based on the record, in order that the jury could understand the question asked. Coulson v. Clark, 319 S.W.2d 183 (Tex. Civ.App., Austin, writ ref. n. r. e.).

■ It is settled that an appellate court will not reverse and remand a case because of the exclusion of evidence properly admissible unless it be determined that in all reasonable probability the jury returned a verdict other than the finding it would have made if it had had the benefit of the excluded testimony. Rule 434, Texas Rules of Civil Procedure; Maddox v. Gulf, Colorado and Santa Fe Railway Co., supra; Ryder Tank Lines v. Bentley, 397 S.W.2d 914 (Tex.Civ.App., Fort Worth, writ ref. n. r. e.); Agricultural and Mechanical College v. Guinn, 326 S.W.2d 609 (Tex.Civ. App., Austin, no writ).

■ Nor will the case be reversed if on appeal it is shown that the evidence excluded was cumulative of other and equivalent expert testimony admitted by the trial court. Mrs. Baird's Bread Company v. Hearn, 157 Tex. 159, 300 S.W.2d 646; Agricultural and Mechanical College v. Guinn, supra.

■ In this cause condemnors introduced the expert testimony of Harold Legge that the market value of the land taken was $9,700 and the difference in market value of the land remaining before and after the taking was $13,300, or a total damage of $23,000. If James Culp had been permitted to testify, he would have arrived at a value of $10,000 for the land taken and loss in market of the remainder amounting to $9,500, making a total damage to condemnee of $19,500.

The point of error asserted by appellants because the trial court excluded the testimony of James Culp is overruled.

Condemnors contend that errors complained of under points six through eighteen were calculated to cause and probably did result in an improper and excessive verdict.

We have carefully examined these points of error and conclude that all of the points, six through nineteen, should be overruled.

In the main these points pertain to evidentiary matters related to market value of the remainder, consisting of 6.67 acres of land and all the improvements, before and after the taking of the .8107 of an acre from the front of the tract for highway purposes.

It appears undisputed that the .8107 of an acre condemned for the highway was a strip of land about 416 feet long with a depth most of its length of about 85 feet. This strip of land constituted about one-third of the entire parking area in front of the auction barn and stock facilities owned and operated by Capitol Livestock. The only improvement, or building, within the strip condemned was a small portion of the restaurant building. The parties appear in agreement that alterations necessary for continued use and occupancy of the restaurant were not major.

Capitol Livestock contended throughout the proceedings that reduction of the parking area by one-third rendered it unprofitable for the company to continue its joint operation on the premises with Capitol Cattle Company, Inc., a customer of Capitol Livestock. Capitol Cattle Company did not have a lease on the land and improvements, nor did that corporation own any interest in the land, facilities, and business of Capitol Livestock. A third company, Capitol Feed Company, Inc., also used the facilities, but

had no ownership in the land and improvements. The three corporations had interlocking stockholders, although each company was a separate entity, operating separate businesses, keeping separate books and accounts, and filing separate income tax returns.

Eugene Schwertner, president and owner of fifty percent of the stock of Capitol Livestock, testified that after the hearing before the commissioners in October, 1962, and after he saw how much land would be taken for the highway, his first problem was to decide whether both Capitol Livestock and Capitol Cattle could continue joint use of the property.

"What obstacles were you presented with," counsel for Capitol Livestock asked Schwertner, "as far as operation of the livestock auction company and continuing to yard cattle there for Capitol Cattle Company?"

Schwertner replied, "Well, the first thing, when we found out how much it was going to take, well, we got to looking around there to see what we could do to keep operating both businesses there. We couldn't figure out a way to do it without a lot of money, to operate both businesses there and make them profitable. We could operate both businesses there and still be operating both businesses there, but we couldn't be operating them and making any money. We might have showed a loss."

By moving loading and unloading facilities from the front of the property to the side, and changing arrangement of some of the pens, it was shown that Capitol Livestock could have alleviated parking shortage to some extent and continued use of the property as an auction business only, by an expenditure of about $15,000. Schwertner and his associates decided that both Capitol Livestock and Capitol Cattle could not continue joint use of the property. Capitol Cattle shipped and received cattle daily, and this, Schwertner testified, would interfere with auction customers who came in twice a week, due to reduced parking. It was

shown that Capitol Livestock had an annual income of about $20,000 from Capitol Cattle in yardage fees on stock handled daily at the barn.

Schwertner testified that after the hearing in October, 1962, the decision was made to sell the land, improvements, and auction business of Capitol Livestock. The contract made November 1, under which Capitol Livestock sold out, included the business, as well as the land and improvements, and provided that Schwertner would not engage in the auction business within fifty miles of Austin.

Even with certain modifications in the physical plant, at an expenditure of approximately $15,000, it was shown that the remainder facilities could not be used as an auction business in the same manner as before the taking. This would be true, even if the daily yarding of livestock for Capitol Cattle, or other customers, were not carried on. The critical change resulting from the taking of the .8107 of an acre was the loss of parking space sufficient to accommodate customers on auction days which could not be provided elsewhere on the tract, since practically all of the area remaining was occupied by pens, sheds and buildings used in the auction and yarding operations.

Capitol Livestock tried this case on the theory that the loss of about one-third of the parking space would reduce the income that the business could produce, resulting in diminution of the market value because a willing buyer would not pay as much for the property after the taking of the parking space. Condemnors consistently resisted introduction of any evidence showing income of the business in past years of operating the property because condemnee was not entitled to damages for loss of anticipated income and profits.

Condemnors rely upon State v. Zaruba, 418 S.W.2d 499 (Tex.1967). In that case the Supreme Court held that the testimony of the owner of a business as to loss of value of the business itself would not sup-

port a finding of the jury as to market value of the remainder before a partial taking where value of the business and its good will were included in the value of the whole property before the taking.

The condemnee relies upon City of Dallas v. Priolo, 150 Tex. 423, 242 S.W.2d 176 (1951), and Milam County v. Akers, 181 S.W.2d 719 (Tex.Civ.App., Austin, writ ref. w. o. m.). The rule of these cases is simply that injury to the business of an owner of the land on which the business is conducted may, in a proceeding involving a partial taking, plead and prove the injury, not as a separate item of damage, but as affecting market value of the property for uses to which it was adapted and being used.

We are unable to agree with condemnors that the testimony offered by the condemnee included the element of business good will or profits in such manner as to violate the rule of State v. Zaruba, supra.

Both Eugene Schwertner and R. L. Wyatt, Jr., stockholders in Capitol Livestock, testified to market value of land and improvements, as well as value of the business itself, but the value placed on the business was by each of these witnesses separated from market value of land and improvements. The uncontradicted evidence was that after the condemnation proceedings had progressed beyond a decision by the special commissioners, Capitol Livestock contracted to sell the 6.67 acres remaining and the improvements for $100,000 and to sell the business itself for $50,000. We do not find that either Wyatt or Schwertner included the value of the business and its good will in the value of the whole property before the taking or after the taking.

Wyatt testified that the remainder portion, before the taking, had a market value of $250,000, and that after the taking the remaining land with improvements was worth $100,000. Schwertner testified that the market value of the 6.67 acres with improvements before the taking was between $248,000 and $273,000, and that after the

taking the remainder had a value of $100,000. Both Wyatt and Schwertner gave consideration to reduction in income, because of inability to provide adequate space for parking and maneuvering large cattle trucks after the taking, in arriving at market value for the remainder after the taking. Coupled with this consideration was the undisputed fact that the land and improvements sold after the taking for $100,000. The market value before the taking clearly was arrived at by Wyatt and Schwertner based in part on the type and scope of operation that they had been able to conduct on the property in years immediately prior to the taking, which obviously involved consideration of the income this property would produce under the combined operations in which Capitol Livestock engaged.

It is not disputed that the property produced in excess of $300,000 net income over a five-year period immediately prior to the taking. It was Schwertner's testimony that in stating a value of $300,000 to $325,000 for the entire property, he considered the income over five years, which he indicated was sufficient to pay for the investment in the property.

The jury, in answering Special Issue No. 3, found that the market value of the remainder, after the taking, was $150,000, the exact amount of the sale price of the land, improvements, and business. The landowners, as already pointed out, testified that the remainder had a value of $100,000 after the taking, and Legge, expert witness for the condemnors, testified the remainder after the taking was worth $136,000. Condemnors complain that the jury's finding was contrary to the testimony and was greater than any figure given by the witnesses. By finding the remainder after the taking to be worth $50,000 more than the value claimed by the landowners, the jury in effect awarded damages for $50,000 less than the amount Capitol Livestock contended it was entitled to receive. This action did not result in any probable injury to condemnors, and any error claim-

ed by reason of the jury's answer was harmless.

■ The measure of damages to the residue after condemnation is the market value of the remaining property immediately before the taking, less the market value immediately after the taking. State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194; Tuttle v. State, 381 S.W.2d 330 (Tex.Civ. App., Texarkana, writ ref. n. r. e.). City of Amarillo v. Nelson, 428 S.W.2d 141 (Tex.Civ.App., Amarillo, no writ). The rule is settled that value is established through testimony of qualified witnesses expressing opinion as to market value before and after condemnation. The jury is restricted in considering the value of the remainder after the taking only to the lowest figure to which a witness testified. Maddox v. Gulf, Colorado and Santa Fe Railway Co., supra; Southwestern Electric Power Company v. Presswood, 420 S.W.2d 182 (Tex.Civ.App., Tyler, no writ).

Such points of error as condemnors have directed to the judgment of the trial court based on the jury findings as to value of the residue before and after the taking are overruled.

Condemnors complain under points of error 20 and 21 that there was no evidence and insufficient evidence to support the jury's findings that the market value of the land taken was $41,678.

■ The landowners, Wyatt and Schwertner, testified to a market value of $50,000 and $52,000. S. P. Kinser, an expert called by the condemnee, testified to a value of $125 per front foot, a total value of $52,000. Joe Perrone, also called by condemnee, testified as a qualified expert that the land taken had a value of $100 per front foot, or $41,600 for the part taken. Harold Legge, an expert called by condemnors, testified to a value of $9,700, which would give the condemned land a value of about $23 per front foot.

The finding of the jury was amply supported by the evidence, and the points of error are overruled.

Under point 23 condemnors complain that the trial court erred in allowing counsel for condemnee to take the deposition of Harold Legge, an expert witness, and examine him regarding his testimony before the special commissioners. Before the commissioners Legge had assigned a market value of the residue approximately $100.-000 higher than the value given by him at the trial.

■ Condemnors contend that the appraisal Legge made prior to his testimony at the hearing before the commissioners and his testimony at the hearing based on his appraisal were privileged matters, immune from discovery, and not properly the subject of examination by opposing counsel. We cannot agree with this contention and the point is overruled. State v. Biggers, 360 S.W.2d 516 (Tex.1962), refusing writ, 358 S.W.2d 188; City of Houston v. Autrey, 351 S.W.2d 948 (Tex.Civ.App., Waco, writ ref. n. r. e.).

The final complaint of condemnors is that the trial court erred in overruling their motion to suppress evidence of the sale of land to the Southwestern Bell Telephone Company because the sale was to a condemning authority and not a comparable sale.

The testimony condemnors sought by motion in limine to suppress pertained to a sale by Dr. T. J. McElhenney to the Southwestern Bell Telephone Company of a tract of land fronting on Highway 183 in the general neighborhood with the land of Capitol Livestock.

Corporations organized to construct and maintain "magnetic telegraph lines" are authorized by statute to enter "any lands owned by private persons or by a corporation" to make surveys and examinations, and " * * * to time appropriate so much of said lands as may be necessary to erect * * * poles, piers, abutments, wires and other necessary fixtures * * *." Articles 1416, 1417, Vernon's Ann.Civ.Sts.

The statutes appear applicable only to telegraph lines, but have been construed to apply to telephone lines as well. Gulf, C. and S. F. Ry. Co. v. Southwestern Tel. and Tel. Co., 25 Tex.Civ.App. 488, 61 S.W. 406 (Tex.Civ.App., Austin, 1901, writ ref.). The Supreme Court of Texas, in response to questions certified from this Court, held in 1900 that the statutes apply to both telegraph and telephone lines, with the observation that:

"The interpretation which confers upon the telephone corporations the rights granted to telegraph corporations harmonizes every provision of the law upon the subject of telegraph and telephone, and is consistent with the well-known history of the times in which these statutory provisions were evolved." San Antonio and A. P. Ry. Co. v. Southwestern Telegraph and Telephone Co., 93 Tex. 313, 55 S.W. 117, 49 A.L.R. 459.

The Supreme Court, in reviewing the history of legislation on telegraph and telephone companies, pointed out that when the first statute was passed, in 1871, authorizing telegraph companies to condemn land for line facilities, "telephones had been recently invented, and were not generally known." The Court observed that if the language of the statute was "broad enough to embrace a subsequently developed method, the later invention might be controlled by the pre-existing law, as if it had been in existence at the time the law was made." (55 S.W. 117, col. 2)

Capitol Livestock contends that Article 1417 does not authorize a telephone company to condemn land for erection of a "dial system exchange" building. Condemnors argue that since the "exchange" is an essential part of the transmission of messages over the telephone lines, the building for housing the "exchange" is one of the "other necessary fixtures" covered by the statute.

Evidence was introduced at the trial that the statute is commonly used by the Southwestern Bell Telephone Company to condemn lands for "underground cables," which are not mentioned in the statute. There was further testimony by an attorney for the telephone company that sites for "dial system exchanges" were condemned only when a site within the exchange area, acceptable to company engineers, could not be acquired by voluntary sale. It appeared undisputed that an "exchange" must be located in the area of each "dial prefix" under the telephone system if the dial service is to be provided in that area.

Applying the reasoning employed by the Supreme Court in San Antonio and A. P. Ry. Co. v. Southwestern Telegraph and Telephone Co., supra, we hold that Article 1417, under the phrase "other necessary fixtures," encompasses "dial system exchanges." When the statute was enacted in 1871, and when in 1900 by judicial pronouncement was declared applicable to telephone companies, neither cross-country underground cables, nor dial system telephones, were commonly employed by telephone companies. Since enactment of the first statute, and since its application by the courts to both telegraph and telephone facilities, great progress has been made in scientific development of communication by means of telephone lines.

We think a "dial system exchange," which is an innovation since 1871 or 1900, being an essential part of communication by means of telephone "poles, piers, abutments, wires," logically and reasonably may be termed one of the "other necessary fixtures" covered by Article 1417. It appears that an "exchange building" is not an office building, in the sense that term is normally used, but is a structure devoted principally and essentially to the housing of equipment for the reception and distribution by automatic means of telephone messages transmitted over telephone wires.

Capitol Livestock contends that the purchase by the Southwestern Bell Telephone Company of the site for its "dial system

exchange" was an " * * * open market transaction between a willing buyer, who shopped several different sites, and a willing seller, who was wholly unaware of any compunctions [sic] to sell by reason of any power of condemnation by the telephone company."

Capitol Livestock contended at the trial that even if the telephone company had the power to condemn under the statute, evidence of its purchase of the exchange site was admissible because the purchase had not been made under threat of condemnation. The trial court was in agreement and stated, "I think those are the magic words, counsel, 'under threat of condemnation.'"

On appeal the position of Capitol Livestock is that the telephone company considered several different locations before finally purchasing the one in question, and, "Therefore, under these facts Southwestern Bell did not have the right or power to condemn the property it purchased."

■ The rule is that if the purchaser is a public body or a corporation with authority by law to acquire the property by condemnation, testimony as to the price paid for the land is inadmissible in a condemnation suit. Gomez Leon v. State of Texas, 426 S.W.2d 562 (Tex.1968); State v. Curtis, 361 S.W.2d 448 (Tex.Civ.App., San Antonio, writ ref. n. r. e.); Menchaca v. San Antonio Ind. Sch. Dist., 297 S.W.2d 363 (Tex.Civ.App., Waco, writ dismd.).

"The reason for excluding proof of such sales," the Supreme Court stated in Gomez Leon v. State, "is that they do not meet the willing seller-willing buyer concept; they are made under a direct or an implied threat of condemnation and, theoretically at least, are not free and voluntary."

"There is even less reason," the Supreme Court added, "for permitting an expert witness to consider such sales in arriving at an opinion as to the value of property being taken through condemnation and to testify to the prices paid."

■ We do not find from an examination of the decided cases that an exception is made to the rule stated in Gomez Leon v. State even when a showing can be made that the corporation acquired the property by voluntary sale and not in the actual exercise of its power of eminent domain or under an express or implied threat of such power. It is immaterial that by independent evidence the sale can be shown to be voluntary or involuntary, if the purchaser in fact acquired land for a purpose within its statutory power of condemnation. See Robards v. State, 285 S.W.2d 247 (Tex.Civ. App., Austin, writ ref. n. r. e.), for discussion, p. 248, col. 2.

On the question of whether admission of the testimony was prejudicial error, we are governed by Rules 434 and 503, Texas Rules of Civil Procedure. Under these rules, judgment of the trial court may not be reversed on appeal on "the ground that an error of law has been committed * * unless the appellate court shall be of the opinion that the error complained of amounted to such denial of the rights of the petitioner as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case * * *."

■ In arriving at its opinion, as to whether the error amounted to such denial of the rights of appellant "as was reasonably calculated to cause and probably did cause rendition of an improper judgment," the appellate court will determine this question from a consideration of the record as a whole. Gomez Leon v. State, supra; Texas Power and Light Co. v. Hering, 148 Tex. 350, 224 S.W.2d 191.

■ The specific complaint under this point of error is that the trial court "erred in overruling the plaintiff's third

motion to suppress evidence" relating to the McElhenney sale to Southwestern Bell. The trial court was not required in advance of the trial to determine the admissibility of this evidence. Transport Insurance Company v. Nunn, 375 S.W.2d 484 (Tex. Civ.App., Houston, writ ref. n. r. e.); State v. Cave, 430 S.W.2d 692 (Tex.Civ. App., Austin, no writ). Even though the trial court errs in overruling the motion in limine, this action standing alone is not reversible error. To constitute reversible error, the movant must show that the matter sought to be suppressed arose during the trial and that the party making the original motion made timely objection at the trial. State v. Cave, supra, and authorities cited, 430 S.W.2d 692, 694, col. 2.

Condemnors in their motion for new trial and in the point of error complain only of the court's action in overruling the motion in limine to suppress evidence.

The condemnors introduced through their expert witness, Legge, full details of the McElhenney sale to Southwestern Bell. It is settled that complaint may not be made of improper evidence introduced by the adversary if the complaining party has introduced the same evidence relating to the subject. Hughes v. State, 302 S.W.2d 747 (Tex.Civ.App., Eastland, writ ref. n. r. e.).

It is our opinion that the error, even if properly preserved for review on appeal, does not require a reversal. From our consideration of the record as a whole, we conclude that the error did not amount to such denial of the rights of condemnors as was reasonably calculated to cause and probably did cause rendition of an improper judgment.

The judgment of the trial court is affirmed.

Affirmed.